

# SUPREME COURT OF MISSOURI
## en banc

WALTER BARTON,                              )
                                           )
        Appellant,                         )
                                           )
v.                                         )     No. SC93371
                                           )
STATE OF MISSOURI,                         )
                                           )
        Respondent.                        )

### APPEAL FROM THE CIRCUIT COURT OF CASS COUNTY
The Honorable R. Michael Wagner, Judge

*Opinion issued May 13, 2014*

This is an appeal from a Cass County circuit court judgment overruling Walter Barton's Rule 29.15 motion for post-conviction relief after his conviction and sentence to death for the 1991 murder of Gladys Kuehler.

Because Barton was sentenced to death, this Court has jurisdiction over his appeal. Mo. Const. art. V, sec. 10; Order of June 16, 1988.

### Factual and Procedural Background

Gladys Kuehler was found dead in her home in 1991. An autopsy revealed that Kuehler was stabbed more than 50 times, including through her open right eye, 11 times in the left side of the chest, three times in the right side of the chest, twice in the neck, and 23 times in the back. There were two large slash wounds across the victim's neck and two X-shaped slash wounds to the abdomen through which the victim's intestines

protruded. The full details of the crime are set forth in *State v. Barton*, 240 S.W.3d 693 (Mo. banc 2007) (*Barton III*). The relevant facts are summarized here.

The victim, who was 81 years old, was the manager of a mobile home park in Ozark, Missouri, and lived in a trailer she owned there. Barton regularly frequented the park, but had not been around for about a week before the murder. On the day of the murder, Barton came to the trailer of Carol Horton. Horton reported that Barton was in a "happy-go-lucky" mood, talking and dancing to music on the radio. At around 2:00 p.m., Barton went to the victim's trailer to ask if he could borrow $20, and he returned about 10-15 minutes later. Between 2:00 and 3:00 p.m., several people had contact with the victim, including her granddaughter, Debbie Selvidge, who called the victim at around 2:30 p.m.

At around 3:00 p.m., Barton told Horton he was going to go back to the victim's trailer to pick up a check she was going to write for him. At around 3:15 p.m. the mobile home park's owner called the victim's trailer. A man answered the telephone, and the owner asked to speak with the victim. The man hesitated and then said that she was in the bathroom.

At around 4:00 p.m., Barton returned to Horton's trailer and asked to use her restroom. After a while, Horton noticed that Barton had been in the restroom for a while, and Horton had not heard the toilet flush. She went to check on him and found Barton at the sink washing his hands. Barton said that he was washing his hands because he had been working on a car. Horton testified at trial that Barton was in the restroom for a total of around ten minutes. Horton also noted that Barton's mood had changed and that he

was now distant and seemed to be in a hurry. After he washed his hands, Barton asked Horton to take him to his car, but she said she could not because she was going to the victim's trailer. Barton urged Horton not to go, stating in a strong voice that the victim was taking a nap. Horton went anyway and knocked on the victim's door at around 4:15. Horton received no answer.

Meanwhile, the victim's granddaughter, Debbie Selvidge, called the victim at 4:00 p.m. because the two watched the same television program together while talking on the telephone every day. When the victim did not answer, Selvidge went to the trailer to check on her grandmother. She knocked for quite some time but received no answer.

After not hearing from the victim for several hours, Selvidge and Horton contacted the police. The officer called a locksmith and then left to answer another call. Once the locksmith opened the victim's door, Selvidge, Horton, and Barton all entered the victim's trailer. Once inside, Selvidge began to walk down the hallway leading to the bedroom when Barton said, "Ms. Debbie, don't go down the hall." Selvidge noticed the victim's clothes in the bathroom and the toilet lid up, which she considered unusual. She then entered the victim's bedroom and found the victim lying, practically nude, on the floor between the bed and the closet. The bed sheets were soaked with blood, the victim had been stabbed numerous times, and her throat had been cut from ear to ear.

Upon finding the victim, Selvidge bent down to touch her, but Horton told her not to do so. Selvidge then went back into the hall and pushed past Barton. Barton then said, "Let me see," and looked over Horton's shoulder into the bedroom. The testimony at trial indicated that he never got close to the body or the blood in the bedroom. Barton did not

3

get upset when he saw the victim, did not show any emotion, and went to comfort Selvidge.

The police officer returned shortly thereafter and, upon seeing the victim, cleared the scene, called for help, and began questioning everyone present. Upon being questioned, Barton told the officer that the only time he had been at the victim's trailer was to ask to borrow money between 2:00 and 2:30. But Barton later spoke with a highway patrol investigator and told him that he was the one who answered the telephone call in the victim's trailer at around 3:15. The investigator then took Barton into custody.

At that point, the officer noticed what appeared to be blood on Barton's shirt. Barton responded that he got the blood on him when he slipped while pulling Selvidge away from the victim's body. Selvidge later reported that Barton had not pulled her back from the victim and that nobody had fallen in the room. The police also noticed that neither Selvidge nor Horton had any blood on them and that there was no wet blood to slip on where the witnesses were standing in the room.

Tests conducted on Barton's clothing revealed that the blood on his shirt, blue jeans, and boots was human blood. DNA tests conducted on the blood from the shirt showed that it came from the victim. A blood spatter expert opined that some of the blood on Barton's shirt was consistent with stains created by "medium-to-high energy impact," meaning the blood was ejected from the source by a blow or "transfer of energy" and not by simply rubbing up against already-present blood.

At some point after the murder, Barton was incarcerated in the Lawrence County jail, where inmate Katherine Allen was serving meals and doing laundry. Allen testified

4

at trial that, from time to time, she served Barton his meals and that on several occasions they got into arguments during which he threatened to kill her "like he killed that old lady."

Barton first went to trial shortly after the 1991 murder. That first trial ended abruptly when the court granted a mistrial at Barton's request, following his allegation that the prosecution had failed to endorse any witnesses. *State v. Barton*, 936 S.W.2d 781, 782 (Mo. banc 1996). Barton's second trial began in 1992, and the circuit court granted a second mistrial when the jury could not reach a verdict. *Id.* Barton's third trial took place in 1994. The jury convicted Barton of first-degree murder, and the circuit court sentenced Barton to death. This Court reversed the conviction, holding that the circuit court erred in sustaining a prosecution objection to Barton's closing argument. *Id.*

Barton was tried a fourth time, again resulting in a conviction and death sentence. Barton appealed, and this Court affirmed the conviction and sentence. *State v. Barton*, 998 S.W.2d 19 (Mo. banc 1999). Barton filed a Rule 29.15 motion for post-conviction relief. Following a prolonged proceeding that involved a per curium opinion by this Court remanding the case for additional findings, *Barton v. State*, 76 S.W.3d 280 (Mo. banc 2002), the circuit court vacated Barton's conviction, and the State took no appeal. After the circuit court vacated his second conviction, Barton's fifth trial took place in March 2006. During the penalty phase of Barton's fifth trial, the State introduced evidence of Barton's past convictions and victim impact testimony from Selvidge. Defense counsel called two witnesses whom Barton had met through a prison ministry

and Barton's wife, whom he married after the murder. Each witness testified about the impact that Barton's execution would have on their lives.

The jury found the requisite aggravating circumstances and recommended a sentence of death. The circuit court sentenced Barton in accordance with the recommendation, and this Court affirmed the conviction and sentence. *Barton III*, 240 S.W.3d 693.

Barton timely filed the Rule 29.15 motion for post-conviction relief at issue. The circuit court appointed counsel, and counsel filed an amended motion. Following an evidentiary hearing, the circuit court made findings of fact and entered a judgment overruling Barton's motion.

## Standard of Review

This is an appeal from the circuit court's judgment overruling Barton's post-conviction motion. This Court reviews Barton's claims for the limited purpose of determining whether the circuit court clearly erred in making its findings of fact and conclusions of law. Rule 29.15(k); *Johnson v. State*, 333 S.W.3d 459, 463 (Mo. banc 2011). A judgment is clearly erroneous when, after reviewing the entire record, the court is left with the definite and firm impression that the motion court made a mistake. *Baumruk v. State*, 364 S.W.3d 518, 525 (Mo. banc 2012). This Court presumes that the motion court's findings are correct. *Id.*

6

**Analysis of Ineffective Assistance of Counsel Claims**

Barton raises 13 points on appeal.[1]  Ten of Barton's claims allege that he received ineffective assistance of counsel.  "In order to prove that his counsel was ineffective, a movant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced."  *Johnson*, 333 S.W.3d at 463 (internal quotation marks omitted).  "To demonstrate prejudice, a movant must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different."  *Id.*  "This Court presumes that counsel acted professionally in making decisions and that any challenged action was a part of counsel's sound trial strategy."  *Id.*

Most of Barton's ineffective assistance of counsel challenges relate to trial strategy decisions made by his counsel during both the guilt and penalty phases of his trial. "Ineffective assistance of counsel will not lie where the conduct involves the attorney's use of reasonable discretion in a matter of trial strategy, and it is the exceptional case where a court will hold a strategic choice unsound."  *State v. White*, 798 S.W.3d 694, 698 (Mo. banc 1990); *see also Johnson*, 333 S.W.3d at 467; *State v. Heslop*, 842 S.W.2d 72, 77 (Mo. banc 1992).

"Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance."  *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).  "Where counsel has investigated possible

_____

[1] Barton's claims have been reordered, and some have been combined under a single heading, for the sake of clarity and readability.

strategies, courts should rarely second-guess counsel's actual choices." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable[.]" *Strickland v. Washington*, 466 U.S. 668, 690 (1984). "It is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *Anderson*, 196 S.W.3d at 33.

While each claim will be addressed individually, this Court notes at the outset that the circuit court, after the evidentiary hearing on Barton's 29.15 motion, found that:

> Trial counsel in this case were both well experienced and well prepared. They had reviewed the previous testimony of the witnesses, including their testimony in post-conviction proceedings. They expressed a desire to get certain witnesses off the witness stand as expeditiously as possible, and to focus on the issues they deemed crucial to the defense. Thus, the legal presumption that trial counsel had specific reasons for not raising certain issues, or not engaging in specific areas of cross-examination, is particularly appropriate in assessing the conduct of [Barton's] trial attorneys.

Barton's trial counsel testified that their trial strategy was to focus on the important details and not on every single discrepancy that was not significant to their defense. Trial counsel also indicated that they purposely chose not to use certain witnesses who had not been persuasive in Barton's prior trials. The circuit court found that all of counsel's trial strategy was reasonable.

**Cross-Examination of Debbie Selvidge**

Barton claims the motion court clearly erred in overruling his post-conviction motion because he received ineffective assistance of counsel in that effective counsel would have impeached Debbie Selvidge with her prior inconsistent statements regarding what time she called the victim on the afternoon of the murder and for how long they

8

spoke. Barton contends that Selvidge testified at his fifth trial that she called the victim at 2:30 p.m. and spoke with her for 20-25 minutes, but at his past trials she had always testified that she called between 3:00 and 3:30 p.m. Barton suggests that the prosecution's case depended on a strict timeline in which the murder must have occurred at sometime between 3:00 and 4:00 p.m., and that had his counsel impeached Selvidge with her prior inconsistent statements, it would have damaged the prosecution's timeline of the victim's murder by reducing the time that Barton would have had to kill the victim.

The mere failure to impeach a witness does not entitle a movant to relief. *State v. Phillips*, 940 S.W.2d 512, 524 (Mo. banc 1997). Generally, this Court presumes that counsel's decision not to impeach a witness is a matter of trial strategy. *Id.* In proving that counsel was ineffective for failing to impeach a witness, Barton "has the burden of showing that the impeachment would have provided [him] with a defense or would have changed the outcome of the trial, and [he] must also overcome the presumption that counsel's decision not to impeach was a matter of trial strategy." *Id.*

As previously noted, the motion court found that Barton's trial counsel were experienced and well prepared. During the evidentiary hearing on Barton's motion, his trial counsel testified specifically that they planned to get Selvdige off the stand as quickly as possible. Counsel testified that Selvidge was an emotional witness and that "everyone was scared of what could come out of her mouth." Counsel also testified that, because Selvidge was the victim's granddaughter, she would be difficult to cross-examine and that bad things could happen. The motion court found this testimony to be credible and found that trial counsel's strategy was sound.

9

The motion court did not clearly err in rejecting this claim of ineffective assistance of counsel. Barton's counsel made a strategic decision not to cross-examine Selvidge due to her status as a "victim" of the murder. The witness was emotional, and counsel were concerned that cross-examination could have distinct negative consequences. Given these findings, Barton has not met his burden to overcome the presumption that counsel's decision not to impeach was a matter of trial strategy. While Barton's suggestion that counsel should have impeached Selvidge might have also been a reasonable trial strategy, counsel is not ineffective for pursing one trial strategy to the exclusion of another. *Anderson*, 196 S.W.3d at 33.

### Failure to Call Michelle Hampton

Barton claims that his counsel were ineffective in failing to call Michelle Hampton to testify about when she saw Barton on the evening of the murder. Barton asserts that Hampton would have testified that she saw Barton working on Carol Horton's deck from 4:00 to 4:20 p.m. Carol Horton lived in a trailer across the street from Hampton. Barton argues that Hampton's testimony would have undermined the timeline the State attempted to establish during trial, and as a result, the jury would have acquitted him.

"Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel." *State v. Harris*, 870 S.W.2d 798, 816 (Mo. banc 1994). This is because "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* The motion

10

court found that the decision not to call Hampton was a matter of sound trial strategy.[2] The motion court noted that Hampton needed to review her prior testimony in order to remember when she saw Barton and that Hampton actually testified at the evidentiary hearing that she saw Barton working on Horton's deck sometime around 4:00 or 4:20, not necessarily starting at 4:00. At the evidentiary hearing, one member of Barton's trial team testified that he knew that Hampton had testified at previous trials, but he could not remember exactly why they did not call her. Also at the evidentiary hearing, Barton's counsel testified that one of their decisions was to avoid the same things that had failed in the previous trials, including calling the same witnesses. Counsel testified that they reviewed the old trial transcripts, that they made a conscious decision about which witnesses to call, and that they made their decisions concerning which witnesses to call based on the effectiveness, or lack thereof, of their prior testimony.

The motion court did not clearly err in rejecting this claim of ineffective assistance of counsel because Barton did not overcome the presumption that trial counsel's decision not to call Hampton was a matter of reasonable trial strategy. Hampton's credibility certainly would have been an issue given her testimony that she needed to review prior transcripts to remember the exact times that she saw Barton working on the deck.

Moreover, Barton has not explained why, even if Hampton had seen him working

---

[2] The motion court also found that Barton waived this claim because he did not ask Horton if she saw blood on Barton when she saw him at 4:00. The amended Rule 29.15 motion argued that counsel was ineffective for failing to call Horton because Horton would have testified that she saw Barton at 4:00 p.m. and did not notice any blood. However, the amended motion made clear that the significance in failing to call Horton was the missed opportunity to disrupt the State's timeline for the murder. The motion court, therefore, erred in concluding that the claim was

on the deck at 4:00 p.m., Hampton's testimony is inconsistent with the State's theory that the murder occurred *sometime* between 3:00 and 4:00 p.m. Therefore, Barton has not demonstrated that Hampton's testimony would have provided him with a viable defense. Again, while it might have been a reasonable trial strategy to call Hampton to testify, counsel is not ineffective for pursing one reasonable trial strategy to the exclusion of another. *Anderson*, 196 S.W.3d at 33.

**Failure to Impeach Carol Horton**

Barton claims that the motion court clearly erred in overruling his post-conviction motion because he received ineffective assistance of counsel in that effective counsel would have impeached Carol Horton with several prior inconsistent statements.

This Court presumes that counsel's decision not to impeach a witness is a matter of trial strategy. *Phillips*, 940 S.W.2d at 524. In proving that counsel was ineffective for failing to impeach a witness, Barton "has the burden of showing that the impeachment would have provided [him] with a defense or would have changed the outcome of the trial, and [he] must also overcome the presumption that counsel's decision not to impeach was a matter of trial strategy." *Id.*

The motion court found that Barton "presented almost no evidence at the hearing that would refute the legal presumption that trial counsel made sound, strategic decisions about the scope of the cross-examination regarding Ms. Horton." The motion court also

---

waived. However, the motion court also ruled on the merits; therefore, this claim is addressed on the merits here. Because it lacks merit, this Court does not remand for further findings.

12

found that trial counsel "had reviewed all previous transcripts and was familiar with the file and the record." The court stated:

> A review of the record and the evidence leaves this Court firmly convinced that Movant was not prejudiced by the alleged failure of defense counsel to establish these inconsistencies. Because of the passage of time, it is reasonable to expect that minor details of the events of that day will be forgotten or remembered slightly different.
>
> Trial counsel states that their strategy was to focus on the important details and not on every single discrepancy that was not significant to their defense. Such a strategy was sound and trial counsel were effective in their representation of the Movant.

Barton first argues that his trial counsel should have impeached Horton with her prior inconsistent statements concerning Barton's changed demeanor. At Barton's final trial, Horton testified that, on the morning of the murder, Barton was in a jovial mood and that he was dancing to music from the radio. Horton testified that, after Barton returned from the victim's trailer around 4:00 p.m., his mood had changed and he seemed distant as if he were in a hurry. Barton argues that, at a prior trial, Horton stated that Barton was "calm," rather than distant and that she had also indicated that his mood had not changed. Barton argues that trial counsel should have impeached Horton with these inconsistencies because the prosecution ultimately used Barton's changed demeanor as evidence of his guilt. This point is without merit because Barton's trial counsel *did* impeach Horton on this issue using statements she made at one of Barton's previous trials. Counsel cannot be ineffective for "failing" to do something that counsel actually did.[3]

---

[3] Barton's reply brief attempts to change his argument to an argument that counsel was ineffective because the impeachment concerning Barton's demeanor "failed badly." This argument was not included in the amended Rule 29.15 motion; therefore, it is waived on appeal. *Johnson*, 333 S.W.3d at 471.

Barton next argues that his trial counsel should have impeached Horton with her statements, made at prior proceedings, that Barton said he had been working on a car to explain the length of his hand washing. This point is without merit because Horton made the same statement at Barton's most recent trial. When Horton testified about going to check on Barton after he had been in her bathroom for an extended period of time she said that "[h]e seen me standing there and just said that he had been working on a car and he was washing his hands."

Barton also argues that Horton testified at prior trials that Barton told Horton his car was broken down, but that at the final trial, Horton testified that she did not know of any problems with his car. Barton argues that, had counsel impeached Horton on this issue, the jury would have acquitted him. In light of Barton's counsel's testimony that they did not wish to impeach on every single discrepancy and the finding that counsel had reviewed all transcripts relating to Horton, Barton has not overcome the presumption that the scope of cross-examination on this issue was a matter of trial strategy. Furthermore, Barton was not prejudiced by the failure to impeach on this issue. The jury heard that Barton claimed to be working on a car. Whether that was his car is not relevant to that statement, and Barton does not claim that Horton ever said he had been working on his own car. Therefore, Barton has not proven that the outcome of his trial would have been different but for the failure to impeach Horton on this issue.

Lastly, Barton argues that his counsel was ineffective for failing to impeach Horton regarding the length of time that he was washing his hands. At Barton's last trial, Horton testified that Barton washed his hands for ten minutes after returning to her trailer

14

at around 4:00 p.m. At prior trials, Horton had testified that Barton was only washing his hands for four to five minutes, but at every proceeding, Horton testified that Barton was washing his hands for an unusually long time. Nevertheless, Barton argues that impeaching her with her prior statements would have demonstrated that Horton was unable to accurately report how long Barton washed his hands. However, Barton's counsel testified that had the time difference been vital, they would have impeached on the issue. As stated previously, the motion court found that Barton's counsel were well prepared and, as a matter of trial strategy, did not wish to bring up every minor discrepancy. Therefore, Barton fails to overcome the presumption that his counsel's decision not to impeach Horton was a matter of trial strategy.

None of these arguments regarding counsel's impeachment of Horton indicate that counsel's strategy was unreasonable; they merely demonstrate that there was an alternative trial strategy available. Pursuing one reasonable strategy to the exclusion of another does not constitute ineffective assistance of counsel. Therefore, the motion court did not clearly err in finding that counsel was effective in their cross-examination of Horton.

### Failure to Object During Closing Argument

Barton claims that the motion court clearly erred in overruling his post-conviction motion because he received ineffective assistance of counsel in that effective counsel would have objected to an alleged misstatement of the evidence by the prosecutor during closing argument. This issue involves statements Debbie Selvidge made to two police officers shortly after the murder. On the date of the murder, Selvidge told Officer

15

Hodges that Barton had pulled her back from the victim's body.  Hodges testified that he asked Selvidge if Barton pulled her back from the body and she said that he had.  The day after the murder, a second officer, Officer Isringhausen, went to interview Selvidge. Officer Isringhausen testified that Selvidge told him that she did not get past the victim's feet, but had bent over and then Barton had pulled her back from the room.  Selvidge said that no one had fallen in the room.

At closing arguments, the prosecutor argued:

> Walter Barton claimed originally to Hodges that he slipped, and remember this, he never talked about having blood on him until he went to the law enforcement facility and the trained law enforcement people noticed the blood.  You saw the jeans.  You saw the boots.  You saw the shirt.  The shirt looks dirty, quite frankly, and time has faded some of it, but none of the witnesses before they went to law enforcement ever saw blood. Not the lady we went over to have dinner with.  None of them did, but the trained law enforcement saw it, and after they saw it, they asked him about it, and he had to come up with a story.  He thought quick on his feet.  I slipped in the blood.  I was pulling the lady back.  The witnesses all testified he never went in the room.
> Now, the one witness, Debbie - - Carol [sic] Selvidge got confused. She did tell Hodges the night of the murder when she's upset that her grandmother had just been murder that, yeah, that's probably what happened.  The next day, she told Cpl. Isringhausen at the time, no, he never pulled me back.  He got blood on himself and didn't know he had, and then he is trying to cover for it.

Barton argues that the prosecutor deliberately misstated the evidence when he argued that Selvidge told Isringhausen that Barton did not pull her back.  Barton argues that he was prejudiced by this misstatement, and that had his counsel objected to the misstatement, the outcome of this trial would have been different.

"An attorney's failure to object during closing arguments only results in ineffective assistance of counsel if it prejudices the accused and deprives him of a fair trial."  *Zink v.*

16

*State*, 278 S.W.3d 170, 187 (Mo. banc 2009).  "Generally, failure to object during closing argument is not error, but rather a function of trial strategy."  *State v. Clemons*, 946 S.W.2d 206, 228 (Mo. banc 1997).  To prevail on a claim that counsel was ineffective for failure to object at closing argument, a movant must prove that the failure to object was not a matter of trial strategy and that the failure to object was prejudicial.  *See State v. Clay*, 975 S.W.2d 121, 135 (Mo. banc 1998).  "Counsel will not be deemed ineffective for failing to make nonmeritorious objections."  *Id.*  Moreover, because the jury is instructed that the lawyers' arguments are not evidence, prejudice is unlikely to result from the failure to object to statements made in closing argument.

When evaluating whether the failure to object was strategic, this Court is mindful that:

> In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes.  It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good.

*State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996).

The evidence presented at the hearing on Barton's Rule 29.15 motion supports the circuit court's finding that the failure to object to this argument was not ineffective assistance of counsel.  At the evidentiary hearing, defense counsel testified that he listened to the closing arguments and made conscious decisions concerning whether to object.  Counsel further testified that one of the prosecutors in this case "was somebody who I don't think could even foster the intent to try to mislead or do something, so probably he would get more slack from us."  Counsel also testified that objecting to a

17

statement during closing argument raises the risk of highlighting it to the jury.[4]  Barton, therefore, has not overcome the presumption that counsel was acting pursuant to a proper trial strategy.

The motion court did not clearly err in finding that Barton received effective assistance of counsel based on counsel's failure to object to the prosecutor's closing argument.

**Failure to Call Blood Spatter Expert**

Barton claims that he received ineffective assistance of counsel because effective counsel would have called a blood spatter expert to rebut the testimony of the State's blood spatter expert.  Barton argues that, had his counsel called a blood spatter expert, the expert would have confirmed Barton's story regarding how the victim's blood got onto his shirt and the outcome of his trial would have been different.

At the trial, the State called a blood spatter expert to testify that several of the blood stains on Barton's shirt were consistent with medium to high velocity impact spatter.  The expert testified that this type of spatter can come from the blood being propelled through the air after something impacts the blood, i.e., that the spatter was consistent with stabbing or striking a victim. Instead of calling a spatter witness of their

---

[4] The motion court also found that the argument was not improper.  The motion court made a finding that the prosecutor was arguing that no one had gone into the room and that no one ever testified that Barton had been in the room with the exception of Selvidge's single statement to Officer Hodges in which Selvidge stated that Barton had pulled her away *from the body*.  In her statement to Officer Isringhausen, Selvidge stated that she had been pulled away *from the room*. The motion court found that the distinction was clear, and that while the prosecutor indicated that Selvidge told Isringhausen that no one had pulled her back, it was clear from the argument that the prosecutor meant to suggest that no one ever pulled her back from the body, i.e. no one ever

18

own, defense counsel thoroughly cross-examined the State's expert, attempting to undercut his conclusions and his credentials. Counsel also used the cross-examination of the State's expert to attempt to discredit the entire field of blood spatter analysis, calling it a "junk science." Barton now claims that, rather than attempting to discredit the State's expert and blood spatter analysis altogether, counsel should have called their own witness.

"Generally, the selection of a witness and the introduction of evidence are questions of trial strategy and are virtually unchallengeable." *Johnson*, 333 S.W.3d at 463-64. "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *Id.* at 464.

At the motion hearing, defense counsel testified that they consulted with a blood spatter expert and, after the consultation, decided against using any expert at all. Two members of Barton's trial counsel attended a conference called "Life in the Balance," which focused on issues involving defending criminal cases in which the prosecution seeks the death penalty. Counsel testified that one member of Barton's trial team spoke with one of the presenters, who was an expert on blood spatter analysis, about Barton's case. Counsel testified that she showed the expert a number of things from Barton's file and that the expert indicated that there appeared to be three different types of blood stains on Barton's clothing.

---

went into the room. The fact that the prosecutor could have been more precise in his argument does not negate its propriety given the larger context of the statement.

After this consultation, counsel decided that as a matter of strategy they would not call a blood spatter expert. Counsel feared that additional expert testimony could be inconsistent with Barton's story regarding how the blood got onto his clothing. Counsel also feared that, if they hired the expert, the State could bring out the three different types of stains through the defense expert, undercutting Barton's story. Counsel's preferred strategy was to focus only on the high velocity stains cited by the State's expert. One member of Barton's trial team had previous experience with the State's witness and thought that he did not seem particularly credible on the stand. Counsel feared that calling their own blood spatter exert would support the State's expert. Moreover, counsel testified that their theory of the case was that whoever committed the crime would have been covered in blood.

Also at the motion hearing, Barton called two blood spatter experts. The first allegedly was the expert who Barton's trial counsel spoke to at Life in the Balance. That expert testified that he did not remember speaking with Barton's trial counsel and that he would need around 30 hours to render an opinion on the case. The second expert was Stuart James, whom Barton alleges his counsel should have called to testify. James testified that the number of spots was insufficient to establish a high velocity impact pattern. James also testified that those same spots were not transfer stains, but that they had to have been airborne when they came in contact with Barton's shirt. James confirmed the State's expert's testimony that the stains were consistent with high velocity impact spatter, but said that the number of spots was insufficient to establish a pattern.

The motion court found that Barton's counsel was not ineffective, specifically finding that the testimony of Barton's counsel was credible and that James' testimony was not particularly credible. The motion court found that Barton's counsel had adequately looked into whether it was advisable to hire an expert and made a reasonable determination that an expert would do more harm than good.

Based on this record, Barton has not carried his burden of proving either that counsel's investigation of blood spatter experts was insufficient or that counsel's decision not to call a blood spatter expert was a matter of trial strategy. Defense counsel's testimony demonstrates that they conducted a thorough investigation and specifically decided that calling an expert would be detrimental to the defense.

Therefore, the motion court did not clearly err in finding that Barton received effective assistance of counsel based on counsel's failure to call a blood spatter expert.

**Failure to Request a Mistrial**

Barton claims that his trial counsel was ineffective for failure to request that the circuit court declare a mistrial because the prosecution did not present testimony from three jailhouse witnesses whom the prosecution claimed, in its opening statement, would testify. Barton claims he was prejudiced by the prosecution's assertion in its opening statement that two of the uncalled witnesses would testify that Barton admitted killing the victim and that the third uncalled witness would testify that Barton had threatened one of the uncalled witnesses after he testified against Barton. This claim was not raised in Barton's amended Rule 29.15 motion, and therefore, it is, waived.

21

"In any actions under Rule 29.15, any allegations or issues that are not raised in the Rule 29.15 motion are waived on appeal." *Johnson*, 333 S.W.3d at 471. Additionally, "[p]leading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." *Id.* "Furthermore, there is no plain error review in appeals from post-conviction judgments for claims that were not presented in the post-conviction motion." *McLaughlin v. State*, 378 S.W.3d 328, 340 (Mo. banc 2012).[5]

### Failure to Call Penalty Phase Witnesses

Barton claims that the motion court clearly erred in overruling his Rule 29.15 motion because he received ineffective assistance of counsel in that his counsel failed to call a number of witnesses in the penalty phase of his trial. Specifically, Barton alleges that his counsel should have called a doctor to testify that, due to a brain injury, Barton was predisposed to violent impulsive acts and that his counsel should have called several of Barton's family members to testify that Barton had an abusive past and became predisposed to violent acts following a head injury.

The decision of whether to call a witness is presumptively a matter of trial strategy and ordinarily will not support a claim of ineffective assistance of counsel. *Harris*, 870 S.W.2d at 816. To prevail on a claim of ineffective assistance of counsel for failure to call a witness in the penalty phase of a trial, a defendant must show that: (1) counsel knew or should have known of the existence of the witness; (2) the witness could be

---

[5] Barton's point relied on is an attempt to alter his argument on appeal from the claims alleged in his amended Rule 29.15 motion. His amended motion alleged that counsel was ineffective for failing to object to the prosecution's opening argument. The motion court denied the point, in part, because Barton "never actually identifies what the appropriate objection would be, or what relief trial counsel should have requested."

located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony creates a reasonable probability that the defendant would not have been sentenced to death. *See Deck v. State*, 381 S.W.3d 339, 346 (Mo. banc 2012). "When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Barton argues that the decision not to present a number of witnesses was not reasonable trial strategy and that, had these witnesses been presented, the jury would not have sentenced him to death. At the motion hearing, defense counsel testified that their main strategy in the penalty phase was to focus on residual doubt concerning whether Barton was actually guilty of the crime. Counsel testified that it was their desire to avoid presenting any witnesses whose testimony would have made it more likely that Barton committed the crime. Counsel felt that the prosecution's case was fairly thin and decided that Barton's best chance of avoiding death would be to use any of the jury's remaining doubt of Barton's guilt to their advantage. Counsel also testified that Barton did not want to present any witnesses to beg for his life. Counsel also wanted to avoid presenting witnesses who had testified at prior trials and had not been persuasive. The motion court found that this was a reasonable trial strategy. This Court agrees.

Rather than demonstrating that his counsel's trial strategy was unreasonable, Barton has provided an alternative trial strategy. Instead of focusing on residual doubt, Barton claims that his counsel should have presented evidence that Barton was prone to

violent outbursts due to a brain injury sustained when he was a child and evidence that he suffered from limited intellectual functioning, possibly due to fetal alcohol syndrome.

To support this alternative strategy, Barton suggests that his counsel should have presented testimony from Dr. Merikangas, who testified at the evidentiary hearing. Dr. Merikangas testified that it was his opinion that Barton suffered some impulse control issues due to a brain injury suffered when Barton was young. Dr. Merikangas had testified at several of Barton's prior proceedings. Barton's counsel had access to his previous testimony. The motion court found that the decision not to call Dr. Merikangas was a deliberate choice and not due to counsel's failure to investigate. The motion court also found that much of Dr. Merikangas' testimony was difficult to believe, not particularly persuasive, or "seemed to defy common sense and logic."

Barton also argues that his counsel should have called a number of his family members, many of whom would have testified that Barton had an abusive childhood and that he became unpredictable after sustaining a head injury. Testimony from each family member was presented at the motion hearing, mostly by affidavit or deposition testimony. Many of the family members admitted they had not been in contact with Barton for many years, and some even thought he had already been executed. Some of the testimony regarding Barton's upbringing was contradictory. Two of these family members were called at Barton's fourth trial, and counsel had access to their prior testimony. Counsel also had access to the affidavits of other family members, which had been presented at previous proceedings. The motion court found that, "[N]one of these witnesses offered any compelling evidence or information that would have altered the outcome of the trial."

Moreover, the court reemphasized that it was Barton's counsel's trial strategy not to recall the same witnesses who had been unpersuasive in the past.

The motion court did not clearly err in determining that Barton received effective assistance of counsel. Barton's trial counsel specifically stated that their strategy was to use the jury's residual doubt of Barton's guilt to argue against the death penalty. Such a strategy was reasonable. Barton has not demonstrated that his counsel's strategy was unreasonable, only that a reasonable alternative strategy existed.

**Penalty Phase Closing Argument**

Barton claims that the motion court clearly erred in overruling his Rule 29.15 motion because he received ineffective assistance of counsel in that his counsel's penalty phase closing argument was rambling and incoherent to the point that it became prejudicial. Barton argues that trial counsel did not argue mitigating evidence but, instead, argued that the death penalty was morally repugnant.

During the penalty phase, trial counsel presented testimony from three witnesses: two women Barton had met through a prison ministry and Barton's current wife, whom Barton met when she began sending him letters as part of a pen pal organization. Each of these three women testified that Barton was an important part of her life and that each would miss Barton very dearly if he were to be executed. His wife testified that Barton had been a positive influence on her son and that he too would find Barton's execution difficult to bear. On cross-examination of these witnesses, the prosecution's questioning attempted to cast doubt on how much these witnesses would miss Barton by asking if they were ever afraid of him or if they knew what he had done.

25

Defense counsel's closing argument made use of both the testimony of the witnesses and the prosecution's cross-examination. Defense counsel's argument suggested that the death penalty was morally repugnant and ignored the feelings of the three witnesses who testified on Barton's behalf. Counsel argued that the jury should consider the testimony of the three witnesses in determining whether death was appropriate. Specifically, counsel stated:

> I want to talk to you about what mitigating circumstances are. Mitigating circumstances are things that aren't listed. They are simple human things. … [Barton's wife] loves her husband. [Barton's stepson] loves his stepfather. Those are mitigating circumstances. ... You can find that [Witness] loves [Barton] like a son. ... [T]o suggest that she is not right somehow because she believes this man has a value, that she is somehow inferior, that her feelings of loss are somehow inferior because she loves this man, that is a repugnant stance to take.

Defense counsel coupled this individualized evidence with a plea for mercy. Mercy is a valid sentencing consideration. *See Zink*, 278 S.W.3d at 188 (holding that prosecutors may discuss the concept of mercy because "mercy is a valid sentencing consideration"). Counsel argued that the jury should show mercy because Barton had people who cared for him, because the death penalty was immoral, and because the jury should be "better" than the "Walter Bartons of the world."

Counsel's closing argument was not an unreasonable strategy under all the circumstances. This is particularly true in light of evidence presented by the prosecution that Barton had been involved in two prior incidents involving violent acts against women and in light of the incredibly grisly nature of the victim's murder. Moreover,

26

counsel was armed with the knowledge that the argument Barton now asserts his counsel

should have made proved unsuccessful in previous trials.

### Failure to Investigate "Crooked Stuff" Note

Barton claims that the motion court clearly erred in overruling his Rule 29.15

motion because he received ineffective assistance of counsel in that his counsel failed to

investigate a letter they received from Larry Arnold, a witness who had testified at

previous trials, stating that Arnold had some information concerning "crooked stuff in the

handling of witness[es]." Barton argues that, if his counsel looked into the "crooked

stuff," counsel would have found that a former prosecutor had made a deal with Arnold

that allowed Arnold to have conjugal visits with his girlfriend in exchange for his

testimony against Barton. Barton asserts that he was prejudiced because, had this

information been presented to the circuit court, the court would have considered it

prosecutorial misconduct and either dismissed his case or imposed sanctions against the

prosecution.[6]

> In every criminal case:

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691. A claim for ineffective assistance of counsel based on

counsel's alleged failure to investigate will be successful only if the movant can show:

---

[6] Arnold did not testify at Barton's final trial. Therefore, Barton's claimed prejudice is limited to the alleged prosecutorial misconduct.

(1) that counsel's failure to investigate was unreasonable and (2) that the movant was prejudiced as a result of counsel's unreasonable failure to investigate. *See State v. Butler*, 951 S.W.2d 600, 608-610 (Mo. banc 1997) (finding counsel ineffective for failure to investigate because counsel did not conduct a reasonable investigation and the movant was prejudiced); *Sanders v. State*, 738 S.W.2d 856, 858-861 (Mo. banc 1987) (finding that counsel's decision not to conduct further interviews with a potential witness was reasonable and that the movant was not prejudiced).

At the evidentiary hearing, Barton presented deposition testimony of Arnold and the live testimony of Arnold's former girlfriend. Barton also presented a number of letters sent by Arnold to his former girlfriend, which Barton alleged proved that Arnold and his former girlfriend had conjugal visits. Both Arnold and his former girlfriend testified that they were permitted to visit one another in private in exchange for Arnold's testimony against Barton. Each testified they had sex during these visits.

However, as the motion court found, their testimony conflicted in a number of significant ways. While Arnold testified that the prosecutor had agreed to allow them to have sex in exchange for his testimony, his former girlfriend testified that Arnold never requested that they be allowed to have sex, only that they "not be[] stared at" when they had visits together. Arnold's former girlfriend also testified that the point of the privacy was only to visit, but that they managed to have sex during some of these visits. Additionally, while Arnold testified that they had sex four or five times, his former girlfriend testified that they had sex "quite a few times." Arnold's former girlfriend also testified that she and Arnold were allowed to have private visits pretty regularly but did

28

not have sex every time. Arnold did not mention any private visits other than the four or five allegedly conjugal visits. Moreover, each witness had a conflicting account of one particular visit that allegedly occurred in the courthouse following Arnold's testimony in one of Barton's trials.

The motion court found that neither Arnold nor his former girlfriend were credible. The motion court specifically found "nothing that Mr. Arnold asserted in his deposition to be credible" and that any claim that Arnold was granted conjugal visits with his girlfriend in exchange for testimony was "untrue." This Court defers to "the motion court's superior opportunity to judge the credibility of witnesses." *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991). Based on its credibility findings, the motion court found that Arnold was permitted to have visits with his former girlfriend, but he never was promised conjugal visits. The motion court also found that Arnold and his former girlfriend "may have had sexual encounters during her visits, but it was not pursuant to any agreement with the State."

Even if the letters are considered—which, at best, create an inference of an intimate relationship—the motion court did not clearly err in finding that there was no sex for testimony deal with Arnold in light of its credibility determinations. Absent the testimony of these two witnesses, the only potential evidence Barton presented to indicate this alleged deal had taken place were the letters Arnold sent to his former girlfriend.

Even assuming that reasonable counsel should have investigated this matter further, Barton was not prejudiced because the motion court determined that the alleged prosecutorial misconduct never occurred.

29

Barton raises two claims that his due process rights recognized under *Brady v. Maryland* have been violated.[7]  "Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), due process is violated where the prosecutor suppresses evidence favorable to the defendant that is material to either guilt or punishment."  *Anderson*, 196 S.W.3d at 36.  Under the disclosure requirements of *Brady*, the prosecutor is required to disclose impeachment evidence as well as exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).

A *Brady* claim has three components: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) the evidence must have been suppressed by the State, either willfully or inadvertently; and 3) prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In the many cases that have followed *Brady*, the terms "prejudice" and "material" have been used interchangeably.  As a result, evidence is only prejudicial if it is material, and evidence is only material, for the purpose of *Brady* claims, if the defendant was prejudiced by its nondisclosure.  According to these cases, evidence is material, i.e., prejudicial, only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 280.  "The question is not whether the defendant would more likely than not have received a

---

[7] Along with each of these *Brady* claims, Barton asserts that the prosecution violated the disclosure requirements of Rule 25.03.  This claim was not included in Barton's amended Rule 29.15 motion.  Barton's amended motion claimed only that the failure to make these disclosures violated Barton's right to due process guaranteed under *Brady*.  Because Barton's claim under

different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90. The materiality inquiry is not simply a matter of whether, after discounting the inculpatory evidence, there remains sufficient evidence to support the conviction. *Id.* at 290. "Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

Barton first claims that the prosecution failed to disclose that Selvidge had been convicted of two misdemeanors between Barton's last two trials. At the evidentiary hearing, Barton presented evidence that Selvidge pleaded guilty to third-degree assault in 2002 and that she was convicted of violating a protective order in 2003. Each of these convictions occurred before Barton's final trial, but after all of Barton's other proceedings. Each conviction is a misdemeanor. The prosecution testified that it was unaware of the convictions and that it had run a search of MULES, a state wide database provided by the Missouri Highway Patrol, which indicated that Selvidge had no convictions. Barton's counsel testified that they did not remember seeing that Selvidge had any convictions, but they believed that they had not.

Barton alleges that, had his counsel known that Selvidge had two prior convictions, they would have been able to use them to impeach Selvidge.[8] Barton argues

Rule 25.03 was not raised in the amended motion, that claim is waived. *Johnson*, 333 S.W.3d at 471.

[8] Barton also alleges that, had his counsel known about the convictions, they could have investigated the underlying conduct and used that conduct to undermine Selvidge's character. However, "a witness may not be impeached by evidence that his or her 'general moral character is bad' or that his or her 'general reputation for morality' is bad." *Mitchell v. Kardesch*, 313 S.W.3d 667, 677 (Mo. banc 2010). Instead, impeachment with character evidence is limited to

31

that, if Selvidge had been impeached with these convictions, her testimony that Barton did not touch her on the day of the murder and her testimony that Barton told her not to go down the hallway would have been significantly undermined, leading to a reasonable probability of a different result.

The motion court stated that, even assuming that the convictions were not disclosed and were not known to the defense, it was "nevertheless firmly convinced that these records would not have changed the outcome of the trial." The motion court found that, while convictions may be used to impeach a witness, Selvidge's two misdemeanor convictions would not seriously impeach her credibility. The motion court found that the only truly disputed portion of her testimony was whether Barton ever pulled her back from the room and that, while Selvidge's testimony was important, these two convictions would not have altered the jury's assessment of Selvidge. The court also found that the prosecution had made a diligent effort to find any prior convictions.

The motion court did not clearly err. Even assuming that Barton has shown the first two elements of a *Brady* claim—favorable evidence and suppression—this Court, like the motion court before it, is firmly convinced that disclosure of Selvidge's convictions would not have altered the outcome of the trial. The motion court did not clearly err in finding that these particular misdemeanor convictions are unlikely to have seriously undermined Selvidge's credibility.

---

the witness's character for truthfulness and veracity. *Id.* Therefore, Barton's argument that he could have impeached Selvidge with evidence of her bad overall character is without merit and borderline frivolous.

Moreover, two other witnesses—Carol Horton and the State's blood spatter expert—corroborated Selvidge's account. Horton testified at trial that no one went into the victim's bedroom and that Barton did not pull Selvidge back from the room. Horton also testified that Barton told Selvidge not to go down the hallway. The blood spatter expert testified that there were a number of stains on Barton's shirt that could not have gotten there simply by rubbing up against wet blood. The blood spatter expert testified that the spatter was also inconsistent with Barton slipping into the blood.

This corroborating testimony is significant because it serves to minimize any damage that might have been done to Selvidge's credibility by the introduction of her prior misdemeanor convictions. The introduction of Selvidge's prior convictions simply would not have "put the whole case in such a different light as to undermine confidence in the verdict."

The record, therefore, provides strong support for the conclusion that Barton would have been convicted and sentenced to death even if Selvidge had been impeached with her prior convictions. Given the nature of her offenses and the corroborating testimony, Selvidge's prior convictions were not "material to either guilt or punishment," and Barton was not prejudiced by their alleged suppression.

Barton's next *Brady* claim alleges that the prosecution failed to disclose an alleged statement by Horton indicating that she heard a radio playing in the victim's home at 4:15 but did not hear it later that day. Barton alleges that the statement was found in the form of notes contained within the prosecutor's file. Barton argues that these notes are from an interview with Horton, and had the notes been disclosed, Barton would have been able to

impeach Horton's testimony that she heard nothing at 4:15 or refresh her recollection. Barton argues that, had this been done, it would have so disrupted the timeline of the murder that Barton would have been acquitted.

There are two problems with Barton's claim. First, Barton has failed to prove that the notes are actually notes of an interview with Horton. At the hearing on Barton's amended Rule 29.15 motion, the State stipulated that the notes were from the prosecutor's files. Barton presented no other evidence about the notes. As the motion court found, "[t]he author of the notes, as well as the basis for the information contained in the notes, is unknown and unexplained." Moreover, the motion court found that it did not know if "the notes were from an actual interview with Ms. Horton, were the unknown author's summary of police reports, were his/her summary of the preliminary hearing testimony, or were the unknown author's personal recollections of what the evidence was or would be." As already noted, to prevail on a *Brady* claim, Barton must show that the allegedly suppressed evidence is exculpatory or impeaching. While Barton claims that he could have used the notes to impeach Horton, he has not shown how. There is no evidence to support Barton's assertion that these notes are a prior statement of Horton's, and Barton has not demonstrated how these notes could be used to refresh Horton's recollection.

Second, even assuming Barton can demonstrate that the notes are from an interview with Horton, Barton already had access to Horton's statement that she heard a radio. In her testimony during a 1992 preliminary hearing, Horton made the same statement—that she thought she heard the victim's radio playing when she went to check on her at 4:15. "*Brady* applies where, after trial, the defense discovers new information

34

that the prosecution knew at trial. If the defense knew about the evidence at the time of trial, no *Brady* violation occurred." *Gill v. State*, 300 S.W.3d 225, 231 (Mo. banc 2009) (citation omitted). Barton argues that the true significance was that Horton did *not* hear a radio later in the day. However, Horton has repeatedly testified that the trailer was silent when she went to check on the victim.

Therefore, because Barton has failed to demonstrate that the notes could have been used to impeach Horton, and because he already had all the information contained in the notes available to him at the time of the trial, the motion court did not clearly err in overruling Barton's Rule 29.15 motion on this ground.

## Delay Between Sentencing and Execution

Barton's final point argues that the delay of more than 20 years in carrying out his death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment and the due process clause of the Fourteenth Amendment. Barton did not raise this Eighth Amendment claim in his amended Rule 29.15 motion. His amended Rule 29.15 motion alleged that it was cruel and unusual punishment to execute him due to his alleged diminished capacity, a claim that has not been raised in this Court. As previously stated, any allegations not raised in the Rule 29.15 motion are waived on appeal. *Johnson*, 333 S.W.3d at 471.[9]

---

[9] Even if Barton had not waived his claim that the delay between sentencing and execution constituted cruel and unusual punishment, Barton has cited no authority to advance his argument. The cases that he claims support this proposition are *Valle v. Florida*, 132 S.Ct. 1, 1 (2011) (Breyer, J., dissenting from denial of stay); *Knight v. Florida*, 528 U.S. 990, 993 (1999) (Breyer, J., dissenting from denial of certiorari); and *Lackey v. Texas*, 514 U.S. 1045, 1045 (1995) (Stevens, J., memorandum respecting the denial of certiorari). None of these cases supports Barton's position. They serve only to indicate that, at one point, one or two justices of the United

On the other hand, Barton alleged in his amended Rule 29.15 motion that the delay between his sentencing and execution violated his rights to due process. The argument section of Barton's brief involving the delay focuses entirely on the waived Eighth Amendment claim. The only cases that Barton cites that even remotely relate to the due process clause are *Lankford v. Idaho*, 500 U.S. 110 (1991), and *Woodson v. North Carolina*, 428 U.S. 280 (1976). Each of these cases discusses the propriety of sentencing procedures, but neither case addresses the delay between sentencing and execution. This claim, therefore, lacks merit.

### Conclusion

After reviewing the record as a whole, this Court determines that the motion court's findings and conclusions are not clearly erroneous. Therefore, the judgment is affirmed.

_____
Zel M. Fischer, Judge

All Concur.

---

States Supreme Court thought that the topic was worthy of discussion. Moreover, as Justice Thomas' opinion concurring in the denial of certiorari in *Knight* pointed out, every case to have addressed this claim on the merits has rejected it. *Knight*, 528 U.S. at 992-93, 993 n.4 (Thomas, J., concurring in the denial of certiorari).