

# In the Missouri Court of Appeals
## Eastern District
### DIVISON FOUR

NATHANIEL A. ROBINSON,        )      No. ED101830
)
    Appellant,           )      Appeal from the Circuit Court of
)      the City of St. Louis
vs.                      )
)
STATE OF MISSOURI,        )      Honorable Philip Heagney
)
    Respondent.          )      Filed: September 15, 2015

### *Introduction*

Nathaniel Robinson (Movant) appeals the judgment of the Circuit Court of the City of St. Louis denying his Rule 29.15 motion for relief from convictions for involuntary manslaughter and abuse of a child resulting in death. Movant asserts that the motion court erred in denying his claim that trial counsel was ineffective in: (1) adducing prejudicial testimony on cross-examination; and (2) failing to call a witness. We affirm.

### *Factual and Procedural Background*

In Summer 2007, Movant's son D.V., then three years of age, was staying with Movant, Movant's wife, Leona Robinson, and their four children.[1] Movant, the primary caregiver, disciplined D.V. more harshly than the other children because D.V. was "slower than the other kids." Movant would hit D.V. with his hand and "pick him up and shake him."

---

[1] Movant and Mrs. Robinson's children included D.V.'s six-year-old half-brother N.R., as well as his five-year-old half-sister, two-year-old half-brother, and five-month-old half-sister.

On the morning of July 4, 2007, Movant, the sole adult at home with the children, called 911 because D.V. was unconscious. When the paramedics delivered D.V. to the emergency room at Cardinal Glennon Children's Hospital, he was in full cardiopulmonary arrest and his body exhibited injuries indicative of abuse. Although doctors were able to restart D.V.'s heart, he showed no signs of neurological activity. D.V. died on July 5, 2007.

1. *Jury trial*

The State charged Movant with murder in the first-degree and abuse of a child, and the trial court conducted a five-day jury trial in January 2010. At trial, the State presented D.V.'s mother, who testified that, although D.V. suffered from asthma, he was healthy and uninjured when she brought him to Movant's home in June 2007. The State also presented Mrs. Robinson, who stated that Movant disciplined the children by giving them "a whipping" with "[h]is hands or belts." Mrs. Robinson believed that Movant "was kind of more rougher and tougher on [D.V.] and harder on him" because D.V. "was always the last to do things" and Movant wanted D.V. "to toughen up." Mrs. Robinson intervened on one occasion when Movant "picked [D.V.] up by his legs and took him into the children's room and shut the door and started spanking – whooping him. Spanking him."

Mrs. Robinson testified that D.V. was healthy when she left for work on July 3, 2007 and, when she returned home, Movant did not mention that D.V. had suffered any seizures or falls. On the morning of July 4, 2007, she arose and went to the grocery store while the children slept. When she arrived home, Movant met her on the porch, laughed at her inability to parallel park, parked the car, and helped her carry in groceries. Noticing that he was not with the other children, Mrs. Robinson inquired about D.V., and Movant "just said he was gone and he sat down and smoked a cigarette and stared." After searching the apartment, Mrs. Robinson again

2

asked Movant where D.V. was, and Movant "told me that he had had a seizure and he called the ambulance because he stopped breathing on him and they had to come and get him." Movant did not know where the ambulance had taken D.V.

Movant's eldest child, nine-year-old N.R., testified that he observed Movant "whip on" D.V. and "pick him up and shake him." N.R. stated that, on July 3, 2007, Movant took him and his brothers to the park. At the park, D.V. "ran up the slide and fell and hit his . . . front head." When the family returned home, D.V. ate lunch, napped, and played tag. The following morning, N.R. awoke to the sound of D.V. crying because "he was getting a whipping." N.R. believed that Movant was "whipping" D.V. with a belt. The State played for the jury the video recording of N.R.'s conversation with a forensic interviewer on July 6, 2007.

Dr. James Gerard, the emergency room doctor who resuscitated and examined D.V., testified extensively to D.V.'s external and internal injuries. Dr. Gerard stated:

> On further examination at this time, it was apparent that he had sustained a number of different types of traumatic injuries. He had multiple bruises on his body. He had lacerations or large cuts on his body. And he had what we called a subconjunctival hemorrhage in one of his eyes. Which is typically, most often a traumatic type of injury. And then on further examination, in the back of his eyes, we saw what we called retinal hemorrhages which are very typically an abuse – related to an abuse type of injury. So we – we noted a number of physical findings that were consistent with significant, traumatic injury.

Dr. Gerard went on to identify photographs depicting the following injuries to D.V.'s body: bruises and lacerations on his back; bruising on his scrotum and right thigh; bruising on both ears; multiple small abrasions on his hands; bruising on multiple fingers; subconjunctive hemorrhage in his right eye; "multiple areas of bruising to the patient's face" and "across the forehead"; multiple linear abrasions on his right leg; and linear lacerations and bruising on his chin. Dr. Gerard also noted "marked bilateral retinal hemorrhages" in both eyes, which is

generally caused by "violent shaking associated with sudden acceleration and deceleration. So someone who is shaking a person and then, you know, strikes their head on an object." Finally, Dr. Gerard stated that D.V. suffered cerebral edema, or brain swelling, which he attributed to "intentionally inflicted [blunt force] trauma . . . . as well, some degree of shaking." He did not believe that seizures, accidental falls, or young siblings could have caused D.V.'s injuries.

Dr. Jane Turner, the assistant medical examiner for the City of St. Louis who performed D.V.'s autopsy, also testified for the State. After listing D.V.'s external injuries,[2] Dr. Turner discussed her "internal findings." Dr. Turner discovered "a large injury of the scalp" called a "subgaleal hemorrhage or contusion," which is typically caused by "blunt trauma." She described the subgaleal hemorrhage as "diffused" meaning "it's everywhere." According to Dr. Turner, a diffused subgaleal hemorrhage cannot be "caused by just a one impact" and "most likely [there were] multiple impacts in order for that injury to be on different sides of the head." Next, Dr. Turner described "a large accumulation of blood [in the cranial cavity] called the subdural hematoma," which was also caused by "blunt impact to the head." In addition, D.V.'s "brain was swollen from this injury" and he suffered retinal hemorrhages, which are "generally associated with closed head injury or what many people refer to as shaken baby." Finally, Dr. Turner testified that she observed "diffused axonal injury . . . related to that mechanism I described of the movement of the head. The sharp acceleration, deceleration injury of the head which people will refer to as shaken baby."

Dr. Turner opined that D.V.'s subgaleal hemorrhage was a "very extensive hemorrhage which would not be consistent with a trivial fall" from a bed or a slide and the force of movement from a seizure could not have cause D.V.'s subdural hematoma. As a result of the

---

[2] Dr. Turner's uninterrupted account of D.V.'s bruises and abrasions filled four pages of trial transcript.

autopsy, Dr. Turner concluded that the cause of D.V's death was "closed head injury" and that D.V. "died at the hands of another person." Dr. Turner explained: "Someone had to have shaken him very violently and – and struck his head very violently in order for him to get these injuries to the brain and around the brain."

On cross-examination, trial counsel asked Dr. Turner, "What facts about this case did you have in your possession prior to your starting your autopsy?" This exchange followed:

> [Dr. Turner]: Well, the facts are that the child was taken to Cardinal Glennon Children's Hospital and ended up dying there after they had determined that he had brain death. There are different accounts of what happened in the – in the investigator's report.

> [Counsel]: Okay. And what- what accounts did you. . . what information did you know about the case before you started your examination? What accounts were available to you?

> [Dr. Turner]: That the personnel at Cardinal Glennon Children's Hospital saw injuries on [D.V.] that concerned them about child abuse so they called the police. [D.V.] was transported to Cardinal Glennon Children's Hospital by ambulance. Let's see. There was a warrant issued for [Movant's] arrest for assault first degree. And he was in police custody at the time that I did the examination. Let's see. The – let's see. [Movant] admits to swatting the child occasionally with a belt and trying to shake him when he was having seizures or reported seizures. [Movant], let's see, was living with his wife and four biological children. When interviewed, his wife told police that [Movant] was physically abusive towards her and the children. Even more so toward [D.V.] since [D.V.] had been living with them. Two of [Defendant's] children reported to the police that he would – [Defendant] would strike [D.V.] often because he lagged behind the other children. The homicide detectives said there were some questions regarding [D.V.'s] ability. And [Movant's] wife was reported to be at work during the events which occurred on the 3rd and 4th of July.

> [Counsel]: Okay. Anything else? Any other information you had in your possession?

> [Dr. Turner]: Then information from – from the doctor at Cardinal Glennon and – and information about consent for harvesting organs for transplantation.

> [Counsel]: Okay. Anything else?

5

[Dr. Turner]: The death was reported to the Missouri Child Abuse Hotline.

[Counsel]: Okay. And that – and those are the facts that you had at the time you conducted your autopsy.

[Dr. Turner]: Well, it was the information that I had at the time of the autopsy.

Trial counsel then elicited Dr. Turner's testimony that, at the time she performed D.V.'s autopsy, she was not aware of the ages of his half-siblings, size of the family's home, or "kind of interaction these children had together each day." Nor did Dr. Turner know whether the children wrestled or whether N.R. had "any violent tendencies in him."

After the close of the State's evidence, Movant's father testified that he stayed with Movant's family for two weeks in June 2007 and, during that time, he did not observe Movant discipline D.V. Finally, Movant testified in his own defense. Movant admitted to spanking D.V., but denied hitting him with a belt or beating him. In regard to the events preceding D.V.'s death, Movant explained that, on July 3, 2007, D.V. fell from "the middle of the slide down and hit the right side of his head." When the family returned home about forty-five minutes later, D.V. was short of breath. As Movant was preparing a snack for D.V., he noticed D.V. "standing there . . . And he's not all the way with it. He's slumped over." Movant stated that he "pushed [D.V.'s] head back and he fall [sic] on the left side of his face. And when he fell, he was in a seizure." Movant panicked and "grabbed him up" and "began shaking his face." D.V. "came out of the seizure," took a bath, ate a snack, and went to sleep.

Movant testified that, on the morning of July 4, 2007, D.V. "got up and rose up. But he wasn't up three seconds. Before I knew it he was going back into that seizure. . . . And before I could get to him, he had – he had fell out the bed on – on the top of his head." Movant stated that, when D.V. fell, Movant "ran over to him and grabbed him up." Movant asserted that Mrs.

6

Robinson had lied about his behavior after 911 call. Movant was unable to explain "all those injuries" to D.V., but insisted that he did not cause them.

After the close of the trial, the trial court instructed the jury on first-degree murder, second-degree murder, involuntary manslaughter, and abuse of a child resulting in death. The jury found Movant guilty of involuntary manslaughter and abuse of a child resulting in death. The trial court sentenced Movant to concurrent terms of seven years' imprisonment for involuntary manslaughter and twenty years' imprisonment for abuse of a child resulting in death. This court affirmed the conviction in State v. Robinson, 353 S.W.3d 448 (Mo.App.E.D. 2011).[3]

### 2. Rule 29.15 hearing

Movant filed a Rule 29.15 motion for post-conviction relief, which counsel amended. In his motion, Movant claimed, *inter alia*, that trial counsel was ineffective in: (1) failing to call as a witness Dr. Stephen Godfrey "to refute the medical examiner's findings that D.V.'s cause of death was homicide by blunt trauma at the hands of another"; and (2) asking Dr. Turner on cross-examination "what information she had regarding the accounts available to her when she conducted the autopsy."

The motion court conducted an evidentiary hearing on Movant's Rule 29.15 motion. At the hearing, Defendant presented Dr. Godfrey, a pathologist retained by the defense prior to trial to review Dr. Turner's findings. Dr. Godfrey agreed with Dr. Turner's conclusion that the cause of D.V.'s death was a traumatic head injury, but he was "less certain about the manner of death being blunt force trauma at the hands of another." Dr. Godfrey testified that trial counsel asked him to review the medical documentation to determine "whether or not a case could be made that

---

[3] However, this court granted Movant's claim that the trial court plainly erred in sentencing Movant as a prior offender because the State did not allege prior-offender status in the charging document. Robinson, 353 S.W.3d at 449. We therefore corrected the judgment and sentence to remove the trial court's classification of Movant as a prior offender. Id. at 450.

7

the alternative explanation [for D.V.'s death] might have been that the child was an undetected diabetic and that high blood sugar either precipitated his seizure which then precipitated falls during which the injury or injuries or occurred." Dr. Godfrey's conclusion, which "probably for the large part wasn't what [trial counsel] hoped to hear," was that "in children, diabetic hyperglycemia tends not to precipitate seizures." Despite this "disappointing" conclusion, Dr. Godfrey stated that he "was still left with a glimmer of hope for [Movant's] case," because "there may have been some other trigger for a seizure" and "[h]aving had a seizure, he could then have fallen or had several falls on playground equipment, on stairs. Who knows where." Dr. Godfrey testified that, even though trial counsel never paid him for his services, he was willing and able to testify at Movant's trial.

On cross-examination, Dr. Godfrey affirmed that, in the report commissioned by the defense, he wrote: "It remains an outside possibility that an accidental fall involving head trauma which then precipitated seizures could be the manner of death." Dr. Godfrey stated that this scenario was "unlikely but not impossible," and he acknowledged that "it's much more likely" that D.V.'s death was "caused by the hands of another." When the prosecutor questioned whether testimony that "it was much more likely that [D.V.'s death] was caused by the hands of another" would have helped the defense, Dr. Godfrey replied: "Right. It doesn't sound like I'm able to provide a lot of really meaningful help for the defendant then when you phrase it that way, and that's the way I phrased it as well."

Finally, Defendant presented trial counsel. Trial counsel stated that Movant's defense at trial was "trying to say that [D.V.'s death] was an accident as best we could" by presenting evidence that D.V. had fallen "a number of times" and suffered seizures. When Movant's post-conviction counsel asked trial counsel why he asked Dr. Turner "about information she had

8

regarding the accounts available to her prior to her conducting the autopsy," trial counsel explained:

> After reviewing the transcript, it became – it was clear to me what my thinking was at the time. It's a technique, because the questions afterwards talk about what she didn't know. So I was trying to elicit from her what she knew, and I was trying to get from her everything that she knew about the account.
>
> Now she crammed some things down my throat that were non-responsive, you know, and you know, it is what it is. But what I was trying to do was to get out in front of the jury that, you know, that she had information before she conducted her autopsy and that this is all of the information she had so that later I could go back and contrast what information she didn't have regarding the family and the interactions between the kids and all that stuff, which I questioned her about after that question.[4]

Trial counsel conceded: "I didn't expect her to tell me that [Movant] beat his wife, and you know, all this other stuff. I didn't expect that answer. I mean, you know, had I known that was the answer I probably wouldn't have – if I knew she was going to include all of that non-responsive stuff, I wouldn't have asked the question[.]" Trial counsel did not move to strike Dr. Turner's non-responsive answer because "[t]hat highlights the issue in front of the jury. . . . You just have to pretend like they didn't say it and move on." Trial counsel agreed that this "uncharged bad acts evidence" was inadmissible and "highly prejudicial" to Movant's case.

---

[4] On cross-examination, trial counsel further elucidated his strategy:

> It's a technique I've used in the past. The problem that you've got if you go after a witness on information they didn't have, they could always come back later and say, "well, I forgot to say this," you know what I mean. So when you're cross-examining a witness on the information they didn't have, then you have to make sure that you've got out all of the information that they did have, because it doesn't work because they can escape on your cross.
>
> So that's why I asked the question, "What's the accounts? Is there anything more? Anything more?" So that later when I nail her with the questions, "Well, you didn't know that they lived together, that he took care of the kids, that the kids were rough housing? You didn't know all that stuff?" She can't come back later and say, "Well, yeah. No. I knew that. I just forgot to answer that question earlier." I mean that's why you do it. But again, you know, she threw in some facts that were harmful to [Movant], yes.

In regard to Dr. Godfrey, trial counsel explained that he decided not to call him at trial because Dr. Godfrey wrote in his report that it "remained to be an outside possibility" that D.V.'s injuries and death resulted from accidental falls. Trial counsel testified that, when he questioned Dr. Godfrey about the report, Dr. Godfrey "couldn't as I recall explain to me what 'outside possibility' meant, and the problem is if I'm sponsoring a piece of evidence, if I sponsor a piece of evidence, then the jury is going to assume that this is the best I've got." Trial counsel further explained:

> [I]f I put Dr. Godfrey on to say that there is an outside – and this is not the State's witness, this is my witness – if I put my witness on to say that there is an outside possibility that this could be an accident, what is a jury going to think? I mean I'm ending up proving the State's case. I couldn't use him because of that language 'outside possibility.' I mean I just couldn't. I'm sorry.

Trial counsel denied that the reason he elected not to call Dr. Godfrey at trial was trial counsel's refusal to pay Dr. Godfrey for his services.

The motion court entered an order denying Movant's Rule 29.15 motion. In its findings of facts and conclusions of law, the motion court held that trial counsel was not ineffective for asking Dr. Turner during cross-examination what information she had regarding "the accounts" at the time of the autopsy because: (1) the question was supported by a reasonable trial strategy; (2) other witnesses testified to Movant's "prior bad acts with respect to D.V."; and (3) there was "significant evidence of guilt" at trial. The motion court further found that trial counsel's decision not to call Dr. Godfrey was a matter of trial strategy. Movant appeals.

### Standard of Review

Our review of the denial of a Rule 29.15 motion is "limited to a determination of whether the findings of facts and conclusions of law are clearly erroneous." Rule 29.15(k). The motion court's findings of facts and conclusions of law are clearly erroneous only if, after reviewing the

10

entire record, we are left with the definite and firm impression that a mistake has been made. Brooks v. State, 242 S.W.3d 705, 708 (Mo. banc 2008).

### *Discussion*

*1. Cross-examination*

In his first point, Movant claims the motion court clearly erred in finding trial counsel was not ineffective for asking the assistant medical examiner, Dr. Turner, on cross-examination, what she knew when she performed D.V.'s autopsy. More specifically, Movant asserts that trial counsel was ineffective in eliciting inadmissible, irrelevant, and prejudicial evidence of prior bad acts and uncharged crimes and, but for counsel's ineffectiveness, the outcome of his trial would have been different. The State counters that the motion court properly denied Movant's Rule 29.15 motion because: (1) trial counsel was not ineffective for asking a question that received a nonresponsive answer; and (2) in light of the "fleeting and vague nature of the reference to other possible crimes and the overwhelming evidence of guilt," Movant cannot demonstrate prejudice.

A movant bears a heavy burden when attempting to show that counsel was ineffective. State v. Powell, 798 S.W.2d 709, 717 (Mo. banc 1990). To prevail on a claim of ineffective assistance of counsel, a movant must show by a preponderance of the evidence that: (1) counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances; and (2) counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the first prong of the Strickland test, a movant must overcome a strong presumption that the challenged action was a sound trial strategy and the result of reasonable professional judgment. Id. at 689. See also Mallow v. State, 439 S.W.3d 764, 771 (Mo. banc 2014). To satisfy the second prong, a movant must demonstrate a reasonable probability that, but for counsel's ineffectiveness, the outcome of the

11

trial would have been different. Strickland, 466 U.S. at 694. A movant must satisfy both the performance prong and prejudice prong of the ineffective assistance of counsel test, and if a movant fails to satisfy one prong, we need not consider the other. Sanders v. State, 738 S.W.2d 856, 857 (Mo. banc 1987).

"A court will not find ineffective assistance where the conduct complained of by the accused involves counsel's use of reasonable discretion in a matter of trial strategy." Johnson v. State, 125 S.W.3d 872, 876 (Mo.App.S.D. 2003) (quotation omitted). "A strategic decision is reasonable if it was made with the same skill and diligence that another reasonably competent attorney would use under similar circumstances." Moore v. State, 431 S.W.3d 15, 21 (Mo.App.E.D. 2014). "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." Barton v. State, 432 S.W.3d 741, 749 (Mo. banc 2014) (quoting Anderson v. State, 196 S.W.3d 28, 33 (Mo. banc 2006)).

In his brief, Movant argues extensively about the inadmissibility of Dr. Turner's statement that Movant abused his wife and children. However, the question before this court is not whether the Dr. Turner's statement was, as Movant claims, "inadmissible, irrelevant, and highly prejudicial." Rather, the issue is whether trial counsel's decision to pose the questions that elicited the statement was reasonable under the circumstances of the case. See, e.g., Moore, 431 S.W.3d at 21.

At the evidentiary hearing, trial counsel testified that his strategy when cross-examining an expert witness is to first elicit the information available to the witness when she formed her opinion and then expose the relevant information that was unknown to that expert in order to cast doubt on her conclusions. According to trial counsel, the purpose of his inquiry was to

demonstrate that Dr. Turner did not consider all of the circumstances surrounding D.V.'s injuries and therefore overlooked other potential, accidental causes. The motion court found that trial counsel "articulated a reasonable trial strategy."

The transcript demonstrates that trial counsel, in fact, employed the strategy he described at the hearing. After trial counsel asked Dr. Turner to recount the information available to her at the time of the autopsy, he questioned whether she knew the ages of D.V.'s half-siblings, the nature of their interactions, the roughness of their play, or whether N.R. had "any violent tendencies" or "liked to punch the other kids." Based on our review of the record, we conclude that trial counsel's strategy for challenging Dr. Turner's conclusion that D.V.'s injuries were nonaccidental was reasonable. The motion court did not clearly err in denying Movant's Rule 29.15 motion because Movant failed to demonstrate that trial counsel did not exercise the customary skill and diligence of a reasonably competent attorney when he cross-examined Dr. Turner. Point denied.

*2. Failure to call a witness*

In his second point on appeal, Movant claims the motion court clearly erred in finding trial counsel was not ineffective for failing to call Dr. Godfrey to refute Dr. Turner's findings. More specifically, Movant asserts that "Dr. Godfrey was willing and able to testify at [Movant's] trial that accidental falls involving head trauma which then precipitated seizures could be the manner of D.V.'s death instead of homicide by blunt trauma at the hands of another." Movant further contends that Dr. Godfrey's testimony would have provided Movant a viable defense at trial and, had Dr. Godfrey testified, there is a reasonable probability the outcome of his trial would have been different. In response, the State argues that trial counsel's decision not to call

13

Dr. Godfrey was a reasonable strategic choice because Dr. Godfrey's testimony would not have unqualifiedly helped the defense.

A decision not to call a witness to testify, as a matter of trial strategy, is virtually unchallengeable. Haidul v. State, 425 S.W.3d 148, 151 (Mo.App.E.D. 2014) (citing Leisure v. State, 828 S.W.2d 872, 875 (Mo. banc 1992)). To establish ineffective assistance of counsel based on failure to call a witness, a movant must demonstrate that: (1) trial counsel knew or should have known of the witness's existence; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense. McDaniel v. State, 460 S.W.3d 18, 29 (Mo. banc 2014). "If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance." Collis v. State, 334 S.W.3d 459, 464 (Mo.App.S.D. 2011) (quoting Worthington v. State, 166 S.W.3d 566, 577 (Mo. banc 2005)).

At the evidentiary hearing, Dr. Godfrey testified that he agreed with Dr. Turner's conclusion that the cause of D.V.'s death was blunt force trauma, but he believed there was an "outside possibility" that the trauma was caused by an accidental fall rather than abuse. Trial counsel testified that, after reviewing Dr. Godfrey's report and speaking to Dr. Godfrey by telephone, he concluded that Dr. Godfrey's testimony would not help, and might even hurt, the defense. Trial counsel explained that, because a jury expects the defendant to present the most persuasive evidence available, if Defendant's "own expert is saying that's just an outside possibility that it could have been caused by an accident . . . . it would have helped to prove the State's case." The motion court agreed and found that Dr. Godfrey's "report and conclusion following examination of the records of this case would not have provided a viable defense and would have helped the State's case."

14

Contrary to Movant's claim on appeal, Dr. Godfrey's testimony did not "refute the medical examiner's findings." Dr. Godfrey agreed with Dr. Turner that the cause of D.V.'s death was blunt force trauma. At the hearing, Dr. Godfrey testified, "I don't doubt that the cause of death is a traumatic head injury as found by the medical examiner's staff for the City of St. Louis in their forensic autopsy." Dr. Godfrey also stated that "the many bruises on this child" were consistent with Dr. Turner's findings of abuse. Furthermore, Dr. Godfrey's proposed testimony regarding an "outside possibility" that D.V.'s traumatic head injury resulted from an accidental fall did not "unqualifiedly support" Movant's defense. Instead, Dr. Godfrey's testimony would have supported the State's case by highlighting the likelihood that D.V.'s death was caused by the hands of another.

"When defense counsel believes a witness' testimony would not unequivocally support his client's position, it is a matter of trial strategy not to call him, and the failure to call such witness does not constitute ineffective assistance of counsel." Winfield v. State, 93 S.W.3d 732, 739 (Mo. banc 2002). The motion court did not clearly err in rejecting Movant's claim of ineffective assistance of counsel because Movant did not overcome the presumption that trial counsel's decision not to call Dr. Godfrey was reasonable trial strategy. Point denied.

### *Conclusion*

The judgment of the motion court is affirmed.

_____
Patricia L. Cohen, Judge

Sherri B. Sullivan, P.J., and
Kurt S. Odenwald, J., concur.

15