

# Missouri Court of Appeals
## Western District

TIMOTHY S. KELLEY,          )
                                    )   **WD85606**
               **Appellant,**   )
**v.**                             )   **OPINION FILED:**
                                      )
**STATE OF MISSOURI,**       )   **July 25, 2023**
                                    )
               **Respondent.**   )
                                    )

**Appeal from the Circuit Court of Henry County, Missouri
The Honorable Michael Brandon Baker, Judge**

**Before Division Two:  W. Douglas Thomson, Presiding Judge,
Cynthia L. Martin, Judge, and Thomas N. Chapman, Judge**

Timothy Kelley ("Kelley") appeals the judgment of the Circuit Court of Henry

County, which denied Kelley's Rule 29.15 motion for postconviction relief following an

evidentiary hearing.  Kelley raises three points on appeal.  Kelley argues that the motion

court erred in denying relief on claims of ineffective assistance of counsel regarding his

trial counsel's performance in cross-examining witnesses, and that the motion court erred

in overruling his motion to amend the judgment.  The judgment is affirmed.

## Background[1]

Kelley was charged with and convicted of first-degree assault for events occurring on September 9, 2013. On that date, Bill Wilson ("Wilson") was checking the mail at a sawmill that he owned on Highway 18 in Henry County. The sawmill had been closed for several years, but Wilson continued to receive mail there. Wilson examined the surroundings of the sawmill when he checked for mail, as there had been thefts in the past of things such as copper from the sawmill. Wilson initially saw nothing unusual. However, as he was examining a credit card bill he had received, Wilson saw a "little truck" speed out of the sawmill's driveway behind him and speed away on the highway. He followed the truck in an effort to get the license plate number.

Wilson followed the truck along Highway 18 for about three miles. The truck then turned onto Highway P, then pulled into the driveway of a vacant house on the left. Wilson parked his vehicle seven or eight feet away on the passenger side of the truck. As Wilson exited his vehicle, he asked the driver, "What the hell are you doing behind the sawmill?" The driver, later identified as Kelley, stated that he "was checking" something. As Wilson walked toward the back of the truck to get the license plate number, he saw "a cut or two" of black-coated wire that resembled wire kept inside the sawmill. Upon seeing the wire, Wilson said to Kelley, "Hell, you were stealing copper." At that point,

---

[1] "On appeal from the motion court's ruling on a Rule 29.15 motion, we view the evidence in the light most favorable to the verdict in the underlying criminal case." *State v. Sprofera*, 613 S.W.3d 822, 824 n.2 (Mo. App. W.D. 2020) (quoting *Hutton v. State*, 345 S.W.3d 373, 374 n.1 (Mo. App. W.D. 2011)).

2

Wilson felt the truck hit him. Wilson was able to grab "ahold" of the truck and lift and push, as Kelley continued to attempt to accelerate the vehicle backwards. Wilson saw Kelley glaring and snarling at him. Wilson heard the truck's tires spinning and the motor revving. Wilson was able to hold onto the truck as it moved him backward from the driveway onto the highway. Wilson stated that the truck was gaining ground on him but was not powerful enough to run him over, as Wilson was able to slow the truck by lifting and pushing and walking backwards with the truck as its tires spun. After the truck had backed Wilson across the highway, Kelley drove forward and away. Wilson then wrote down the license plate number of the truck, called 911, and proceeded to follow the truck for some distance until he lost sight of the truck.[2]

Law enforcement began to search for the Chevrolet S10 truck and located the truck as well as Kelley in a field. At that location, the truck was difficult to see from the road due to vegetation. Coiled wire was found approximately 15 yards away from the truck near a tree.

Officer Brad Saddoris ("Saddoris") met Wilson at the sawmill where Wilson filled out a report. After taking Wilson's statement, Saddoris was notified that the truck had been located, and Saddoris departed to that location.

Officer Lee Hilty ("Hilty") later met Wilson at the scene of the altercation off of Highway P. Hilty examined the vehicle tracks at the scene. Hilty noted spin marks left

---

[2] A recording of the 911 call was admitted into evidence as Exhibit 18.

by both tires of the S10 truck from the driveway to the pavement of the highway; examined the direction that gravel from the driveway was thrown; and observed the solid print of the front tires that followed in the freshly turned dirt. Hilty saw scuff marks in the dirt on the driveway and some black marks start at the edge of the pavement and lighter black marks starting across the road. Hilty stated that the view of the ground matched Wilson's account of events "as far as tire tracks and such."

Kelley testified in his defense. He testified that he was driving on Highway 18 to go to the grocery store when he accidentally defecated in his pants. Kelley said that he stopped and parked by an L-shaped building at the sawmill to change his shorts, and that he saw a person in a vehicle at the mailbox when he left the sawmill to go home and change his pants. At some point, Kelley noticed a vehicle following him, and Kelley pulled into a farmhouse because he figured that the person following him had something to do with the sawmill and wanted to talk to him. Kelley indicated that the person (Wilson) pulled in beside him and got out of his truck swinging his arms and yelling. Kelley said that Wilson was "a big boy" and that Wilson frightened him. Kelley testified that he could not hear anything that Wilson said because Kelley is deaf in both ears and did not have his hearing aids in, but that he could tell Wilson was yelling because he could hear "a high tone" even without his hearing aids. Kelley asserted that he started backing up in his truck while Wilson was beside him, and that he had slowly backed into

4

the road when Wilson hit the back of the truck.[3]  Kelley testified that he then saw Wilson in his rearview mirror standing there making a gesture with his hands, and that Kelley had enough room by then to drive forward and did so.  Kelley testified that he did not spin the wheels of his truck while backing out and that he never intended to run over Wilson.  Kelley testified that he received a phone call from his mother informing him that someone from the Sheriff's Department was looking for him.  Kelley then parked his vehicle next to some trees in a field.  Kelley testified that the wire found in the field was his and was not stolen; that he had never heard Wilson accuse him of stealing wire; and that he had removed the wire from his truck and placed it out of view near a tree because he knew that he would not be able to drive his brother's truck anymore, so the wire would be useless to him.

The jury convicted Kelley of first-degree assault.  Kelley was sentenced as a prior and persistent offender to a term of fifteen years.  Kelley's conviction and sentence were affirmed on direct appeal by per curiam order pursuant to Rule 30.25(b).  *See State v. Kelley*, 507 S.W.3d 181, 181-82 (Mo. App. W.D. 2017).

---

[3] Kelley testified at trial that at some point while he was backing up, Wilson "went like that and hit the back of my truck[,]" and that Kelley then saw Wilson holding his hands in a certain manner, which the transcript states Kelley indicated physically at trial.  At the sentencing hearing, Kelley stated: "When he hit – he hit the back of my truck with his hand, I stopped.  I had enough room to go forward and I did.  I never tried to attempt anything to go backwards after he hit his hand on the back of my truck."  Kelley's version of events asserted that, while backing up, Wilson hit Kelly's truck with his hand, that Kelley did not otherwise contact Wilson with the truck as he was moving backward, and that when Wilson hit the truck with his hand Kelly stopped and drove forward.

Kelley filed a *pro se* Rule 29.15 motion for postconviction relief. Appointed counsel timely filed an amended motion, asserting eleven claims of ineffective assistance of trial and appellate counsel. The motion court denied the motion without conducting an evidentiary hearing. Kelley appealed. This court affirmed the motion court's judgment in part, reversed in part, and remanded for further proceedings after determining that Kelley was entitled to an evidentiary hearing on three of his claims of ineffective assistance of counsel. *See Kelley v. State*, 618 S.W.3d 722, 728 (Mo. App. W.D. 2021).

An evidentiary hearing was held, during which trial counsel, Hilty, Saddoris, and Kelley testified. Following the evidentiary hearing, the motion court entered judgment denying relief on Kelley's claims of ineffective assistance of counsel.

Kelley now appeals to this court.

**Standard of Review**

We review a motion court's judgment denying relief on a Rule 29.15 postconviction motion to determine whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(k); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). A judgment is clearly erroneous only if we are "left with a definite and firm impression that a mistake has been made." *Meiners*, 540 S.W.3d at 836 (citation omitted). "The movant has the burden of proving all allegations by a preponderance of the evidence." *Id.*; Rule 29.15(i). "Even if the stated reason for a motion court's ruling is incorrect, this Court will affirm the judgment if it is sustainable on other grounds."

6

*Dorsey v. State*, 448 S.W.3d 276, 282 (Mo. banc 2014) (citing *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013)).

To be entitled to postconviction relief based on ineffective assistance of trial counsel, the movant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The movant must establish that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Id.* If a movant makes an insufficient showing on either prong of the *Strickland* test, the movant's claim of ineffective assistance of counsel must be denied, and it is unnecessary to address the other prong. *Id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

To establish that counsel's performance was deficient, the movant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The movant must overcome the "strong presumption that trial counsel's conduct was reasonable and effective." *Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019) (quoting *Davis v. State*, 486 S.W.3d 898, 906 (Mo. banc 2016)). To overcome this presumption, "a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson v. State*, 406 S.W.3d 892,

7

901 (Mo. banc 2013) (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. W.D. 2003)).

The movant must also "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. To do so, the movant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hosier*, 593 S.W.3d at 81 (quotation omitted).

## Analysis

Kelley raises three points on appeal. In his first point, he argues that the motion court erred in denying his claim of ineffective assistance of trial counsel based on counsel's failure to cross-examine Wilson with a prior inconsistent statement. In his second point (which Kelley argues is presented in the alternative to his first point), Kelley argues that the trial court erred in denying his motion to amend the judgment because the motion court's factual findings were insufficient. In his third point, Kelley argues that the motion court erred in denying his claim of ineffective assistance of counsel that was based on counsel's failure to adequately cross-examine Detective Hilty regarding his analysis and conclusions of the tire marks at the crime scene.

## Point One

In his amended motion, Kelley raised a claim of ineffective assistance of counsel that was based on his trial counsel's failure to impeach Wilson with a prior inconsistent statement memorialized in the police report of Officer Saddoris. Wilson's statement, as

set forth in Officer Saddoris's report, related Wilson's location (relative to Kelley's truck) at the time that the truck began moving backward.

"The extent of cross-examination is usually a matter of trial strategy." *Rousan v. State*, 48 S.W.3d 576, 594 (Mo. banc 2001). "The mere failure to impeach a witness does not entitle a movant to relief." *Barton v. State*, 432 S.W.3d 741, 750 (Mo. banc 2014). To establish ineffective assistance for failing to impeach a witness, Kelley "has the burden of showing that the impeachment would have provided him with a defense or would have changed the outcome of the trial, and he must also overcome the presumption that counsel's decision not to impeach was a matter of trial strategy." *See id.* (citation and brackets omitted).

Regarding what occurred at the scene of the incident, Wilson testified in his direct examination that after Kelley pulled four or five feet into the driveway off of Highway P, Wilson pulled in beside him with the intention of getting Kelley's license plate number. Wilson stated that as he got out of his vehicle he asked Kelley "what the hell" he was doing behind the sawmill to which Kelley responded that he "was checking" something. As Wilson passed the side of the truck, Wilson saw coils of wire and stated to Kelley, "Hell, you were stealing copper." Wilson testified that he was then hit by the truck and that he did not even know the truck was coming at him when it hit him. After being hit by the truck, Wilson testified that he "got ahold" of the truck and lifted and pushed. Wilson testified that Kelley was looking at him and glaring and snarling as the truck backed Wilson out of the driveway and across the highway. Wilson could hear the

9

truck's tires spinning and the motor "moaning" as Kelley attempted to accelerate the truck. The truck gained ground on Wilson as it backed up, with Wilson stepping backward with the truck and lifting and pushing, but he could not hold the truck. After the truck had backed Wilson across the highway, Kelley put the truck in drive and drove away.

Kelley's trial counsel cross-examined Wilson extensively regarding what occurred at the scene of the incident including where the vehicles of Wilson and Kelley were in relation to the other. Kelley's trial counsel elicited testimony regarding Wilson's tone when he exited his vehicle and whether Wilson was yelling at Kelley, to which Wilson responded that he was not yelling. Then on further questioning, Wilson stated that he could not recall if he yelled at Kelley.

Trial counsel then began to cross-examine Wilson regarding when Kelley began backing up the truck.

Q. Okay. Now, when you got out of your vehicle and started – yelling at him or speaking loudly or whatever, was that when he put his vehicle in gear and started backing up?

A. No, not until I – after I got behind the pickup.

Q. Okay. Didn't you walk around the pickup and get on the driver's side?

A. No. Never.

. . . .

Q. You spoke through the passenger side window?

A. Yes.

Q. Okay. And then – then, is that when he started backing up?
A. I don't know exact – I stepped in behind the pickup, and the pickup hit me.

Q. Okay. Was the pickup moving before you stepped in behind it?

A. No.

Q. You don't think so?

A. I know it wasn't.

. . . .

Q. And – okay. Now, how far behind the pickup did you try to step?

A. Just three feet. Right behind.

Q. Three feet. Three feet. Arms length? You could touch the pickup?

A. Yes.

Q. Okay. And so you – and you tried to step behind the pickup and –

A. I did step behind it.

Q. What?

A. I did step behind it.

Q. Okay. And step behind and, about that time, about the same time you stepped behind it, that's when the pickup hit you?

A. Yes. I didn't have time to write the license number down.

Q. You didn't have the time to write the license down. So actually – actually, the pickup was moving as you were stepping behind it?

A. No.

11

Q. And –

A. It didn't move.

Q. What's that?

A. It didn't move until I said, hell, you're stealing copper.

Q. When did you say that? When you were beside the pickup, looking in the bed?

A. As I stepped behind it.

Q. Were you completely behind it when you said that or still on the side?

A. I was stepping – as I stepped behind it, that's when I looked in it.

Q. Okay. And that's about the same time you say the pickup moved, hit you or –

A. Yes, hit me.

Q. Now, at the preliminary hearing didn't you tell the judge that you picked the pickup up to keep it from hitting you?

A. Yes, I did.

Q. You picked the pickup up?

A. I picked it up enough that he spun his tires.

Q. You picked it up so he spun his tires. And then you let it down?

A. I backed up with it until he put it in drive and drove away.

Q. How fast was he backing up? Not very fast –

A. That's right.

Q. – or you couldn't have kept up with it, could you?

A. That's right.

Q. He was just slowly backing up around?

A. It was – he was doing all he could do with it.

Q. Okay.

A. He just didn't have the power or traction to run over me.

Q. Or he wasn't applying it?

A. No, he was applying it. I could hear the motor revving and the moan of that S-10 engine.

. . . .

Kelley's trial counsel elicited further testimony from Wilson that Wilson would have "shot [Kelley] in a heartbeat" if Wilson had a gun in his hand while Kelley was glaring at him through the back window. Wilson acknowledged he could not say whether the wire found near Kelley's truck came from the sawmill, as it was common wire that could be bought in any hardware store. Regarding where Wilson was standing when he accused Kelley of stealing wire, Wilson stated that he had walked straight from his pickup to the back of Kelley's truck to get the license number and that Wilson never stopped moving toward the back of the truck from the time he got out of the truck.

Officer Saddoris's police report indicated that he made contact with Wilson at the sawmill on September 9, 2013. Regarding what Wilson told him about the scene of the incident, Saddoris's report stated:

13

B.Wilson then stated he parked his own vehicle next to the truck and approached the truck and asked the driver what he had been doing at the sawmill.B. Wilson stated the driver said he had just been looking around.

B.Wilson advised the driver, the property was private and he wasn't supposed to be there. B.Wilson stated he took a few steps and looked into the bed of the truck and noticed rolls of electrical wire. B. Wilson then stated to the driver "You have been stealing wire".The driver then started to back the truck up to leave and B.Wilson went to the rear of the truck to obtain the license number.

Wilson said the driver continued to back up and Wilson braced himself against the tailgate and tried to hold the truck back. Wilson stated the trucks tires started spinning because the driver was accelerating as he was looking back at B. Wilson.B. Wilson stated that he was actually able to hold the truck for a short while before he started to step backwards.

B.Wilson stated the truck backed out into the road facing North and as it pulled away B.Wilson was able to see the license number . . . .

(punctuation as in original). The report then indicated that Wilson provided the license number to authorities and proceeded to follow the truck until he lost sight of it.

Kelley's amended motion argued that Wilson testified at trial that Kelley did not begin to back up the truck until after Wilson was behind the truck, but that Wilson's trial testimony was inconsistent with the sentence contained in Saddoris's report, which indicated: "The driver then started to back the truck up to leave and B.Wilson went to the rear of the truck to obtain the license number." Kelley's amended motion argued that the sentence in Saddoris's report was a statement by Wilson to Saddoris that indicated that Wilson did not step behind the truck prior to Kelley backing up the truck. The amended motion asserted that Kelley's counsel's performance constituted ineffective assistance of counsel because counsel did not inquire of Wilson whether he had previously made such

14

a statement to Officer Saddoris, then seek to introduce that statement as a prior inconsistent statement to be used as substantive evidence.

The motion court initially denied relief on Kelley's claim of ineffective assistance of counsel (based on the cross-examination of Wilson with the statement in Saddoris's report) without conducting an evidentiary hearing. Kelley appealed. Our court determined that the statement contained in the report was a prior inconsistent statement regarding a key fact in contention, which could have had a significant effect on the jury's credibility determinations. *Kelley*, 618 S.W.3d at 740-42. Thus, our court determined that Kelley was entitled to an evidentiary hearing and remanded to the motion court. *Id.* at 742.

Following remand, an evidentiary hearing was held during which Kelley's trial counsel testified. Trial counsel testified that he had reviewed the Henry County Sherriff's Department's incident report, and that he had gone over the report with Kelley several times. Trial counsel testified that he tried to use the incident report at trial to the extent that he saw discrepancies between what Wilson told the police and Wilson's testimony at trial. Trial counsel testified that it would have been helpful to the defense if Wilson had said that he did not go behind the truck until after Kelley began backing up, and that he had argued at trial that Wilson had put himself in harm's way. Trial counsel testified that his strategy at trial was to undermine Wilson's testimony regarding his ability to lift and hold the truck and thereby cast doubt on Wilson's remaining testimony. Trial counsel testified that his tactic was to focus more on Wilson's testimony regarding lifting and

15

holding the truck rather than to focus on whether Wilson was beside or behind the truck when the truck initially began moving. Trial counsel believed that he could "dig more pay dirt" out of Wilson's purported ability to lift and hold the truck rather than Wilson's location when the truck began to move.

Following the evidentiary hearing, the motion court denied relief on this claim. The motion court's judgment summarized Wilson's trial testimony regarding the incident as follows:

> In summation, Mr. Wilson's testimony at trial was that he confronted the Defendant while the Defendant was still in his truck and advised him that he was on private property and he wasn't supposed to be there. Mr. Wilson testified he took a few steps and looked into the bed of the truck and noticed rolls of electrical wire. Mr. Wilson then stated to Defendant that he was "stealing wire" and the Defendant then started to back the truck up to leave. At this time, Mr. Wilson went to the rear of the truck to obtain the license number. Mr. Wilson then testified that he tried to pick up the back of the truck to prevent it hitting him.

The motion court then determined that trial counsel had testified that his strategy was to focus on and discredit Wilson's testimony regarding lifting the back of the truck. The motion court noted that trial counsel's strategy was to discredit Wilson's testimony regarding his ability to lift the back of the truck such that the jury would discredit the entirety of Wilson's testimony. The motion court then concluded that Kelley had failed to

16

establish that his trial counsel's performance was deficient or that he had been prejudiced.[4]

On appeal, Kelley argues that the motion court's summary of Wilson's testimony is clearly erroneous because the record is clear that Wilson testified repeatedly that the truck did not start moving until after Wilson was behind it. Kelley argues further that trial counsel's performance was deficient when counsel failed to cross-examine Wilson with his prior inconsistent statement to Officer Saddoris.

Regarding the finding that Kelley argues is clearly erroneous, Kelley takes issue with the motion court's summary of Wilson's testimony in the following two sentences: "Mr. Wilson then stated to Defendant that he was 'stealing wire' and the Defendant then started to back the truck up to leave. At this time, Mr. Wilson went to the rear of the truck to obtain the license number." Kelley argues that this was the version of Wilson's events contained in Saddoris's report rather than Wilson's testimony at trial, such that the motion court erred in finding that Wilson had so testified.

The State argues that the motion court was merely indicating that Wilson's trial testimony was that he went to the rear of the truck at the same time as Kelley began to back up. We disagree. Although some of Wilson's testimony indicated that he stepped behind the truck concurrently with the truck backing up, Wilson was adamant at trial that

---

[4] Kelley thereafter filed a timely motion to amend the judgment, which was denied by the motion court. The motion to amend is addressed in our analysis of Kelley's second point on appeal *infra*.

he was behind the truck prior to the truck moving backward. Accordingly, the motion court's finding regarding Wilson's testimony is clearly erroneous to the extent that it states that Wilson testified at trial that the truck was moving when he stepped behind it.

Despite the motion court's error with respect to Wilson's testimony at trial, we find that the motion court's ultimate conclusion – that Kelley failed to establish that his counsel's performance was deficient – is correct. Counsel's cross-examination of Wilson and presentation of the case to the jury was objectively reasonable under the circumstances. *See Johnson*, 406 S.W.3d at 901. As reflected by trial counsel's testimony at the evidentiary hearing, trial counsel focused his cross-examination on Wilson's ability to lift and slow the truck, as counsel believed he could achieve more success emphasizing the implausibility of that testimony. Counsel certainly could have also pointed out the inconsistency between Wilson's trial testimony (regarding his location when the truck began moving backward) and his prior statement as reported by Officer Saddoris. However, in light of counsel's stated intention to focus instead on the implausibility of Wilson's other testimony, Kelley has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689.

If counsel had elected to introduce Wilson's prior statement to Saddoris, the State was likely to try to introduce the fact that the remainder of Wilson's statement to Saddoris, including that Kelley continued to try to accelerate the truck while Wilson was behind him, was consistent with Wilson's testimony at trial. The remaining consistencies

might have had an objectively negative effect on Kelley's defense. That is, even if trial counsel were able to convince the jury that Wilson's version of events was more accurate when he spoke to Officer Saddoris, it still would have been necessary for trial counsel to defend against Wilson's testimony that, after the initial contact, Kelley continued to back up while glaring and snarling, spinning the tires and revving the truck's engine in an attempt to run Wilson over. Trial counsel had already elicited testimony from Wilson at trial that the truck hit him "about the same time [he] stepped behind it[,]" such that the jury could already have concluded (from Wilson's testimony) that any initial contact between Kelley and Wilson might have been accidental. However, had the report been introduced, the jury would have seen that more damaging (to Kelley) aspects of Wilson's testimony (regarding whether Kelley continued to accelerate the truck after initial contact) were consistent with the statement given to Saddoris. It was against these more damaging aspects of Wilson's testimony on which trial counsel focused his cross-examination of Wilson and his defense strategy. Such strategy was not objectively unreasonable.

"There are countless ways to provide effective assistance in any given case." *Id.* In cross-examining Wilson, trial counsel was thorough and clearly employed strategy in attempting to discredit Wilson's testimony that he was able to lift and stall the truck or that the truck was not powerful enough to run Wilson over. During closing argument, trial counsel continued to focus on this strategy in presenting Kelley's case to the jury. Trial counsel's performance in cross-examining Wilson and presenting the case to the

19

jury did not fall "below an objective standard of reasonableness." *See id.* at 688.

Kelley's arguments fall short of establishing that his trial counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" *see id.* at 687, or that the result of his trial "is unreliable because of a breakdown in the adversarial process[.]" *See id.* at 696.

Point one is denied.

## Point Two

In his second point, Kelley argues that the trial court erred in denying his motion to amend the judgment because the motion court's factual findings were insufficient. Kelley argues that the motion court denied a claim of ineffective assistance of counsel with an inaccurate understanding of the record regarding Wilson's testimony at trial and denied the motion to amend the judgment that argued the insufficiency of the findings.

Rule 29.15(j) provides that a motion court "shall issue findings of fact and conclusions of law on all issues presented . . . ." Rule 78.07(c) provides: "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review."

In this matter, Kelley filed a motion to amend the judgment that requested that the motion court amend and modify its judgment. The motion stated that it was filed pursuant to Rule 75.01, which authorizes a trial court to retain control over the judgment during the thirty-day period after entry of judgment, and authorizes a trial court to amend

20

or modify its judgment under certain circumstances. The motion did not reference Rule 78.07(c) or argue that the findings made by the motion court were insufficient. The motion did not argue that the motion court failed to make findings on any issue on which findings were required. Rather, the motion argued that the judgment contained a finding that was incorrect. The motion argued that the motion court's judgment included a finding that Wilson had testified that the truck was moving, at which point Wilson went to the rear of the truck to obtain the license number. ("Mr. Wilson then stated to the Defendant that he was 'stealing wire' and the Defendant then started to back the truck up to leave. At this time, Mr. Wilson went to the rear of the truck to obtain the license number."). The motion argued that this was not Wilson's trial testimony, as Wilson was adamant at trial that the truck was not moving until after he had stepped behind it. The motion requested that the trial court amend its judgment to correct its findings regarding Wilson's trial testimony and to reconsider Kelley's claim of ineffective assistance of counsel.

On appeal, Kelley argues that the motion court erred in denying the motion to amend the judgment because the motion court failed to issue sufficient findings of fact. Kelley argues that a claim of insufficient findings is preserved when the claim is raised in a motion to amend the judgment.

Although a motion to amend may properly raise the issue of whether a motion court's findings are sufficient, Kelley's motion to amend the judgment did not argue that the findings were insufficient. Instead, the motion to amend argued that a particular

21

finding was incorrect. Kelley is able to challenge whether the findings and conclusions of the motion court are clearly erroneous in the present appeal, *see* Rule 29.15(k), and Kelley did so in his first point on appeal. The motion court's denial of his motion to amend does not create an additional ground for appeal given that the motion did not argue the insufficiency of the facts found but instead argued whether the motion court's findings were correct.

Point two is denied.

## Point Three

In his third point on appeal, Kelley argues that the motion court erred in denying relief on his claim of ineffective assistance of counsel based on counsel's failure to cross-examine Hilty about his analysis and conclusion regarding the tire marks found at the crime scene.

"The extent of cross-examination is usually a matter of trial strategy." *Rousan v. State*, 48 S.W.3d 576, 594 (Mo. banc 2001). "The mere failure to impeach a witness does not entitle a movant to relief." *Barton v. State*, 432 S.W.3d 741, 750 (Mo. banc 2014). To establish ineffective assistance for failing to impeach a witness, Kelley "has the burden of showing that the impeachment would have provided him with a defense or would have changed the outcome of the trial, and he must also overcome the presumption that counsel's decision not to impeach was a matter of trial strategy." *See id.* (citation and brackets omitted).

Kelley's amended motion alleged that trial counsel unreasonably failed to cross-examine Officer Hilty regarding his experience (or lack thereof) in collision reconstruction and mathematical analysis of crime scenes, regarding his arrival at the scene two hours after the incident, and regarding weaknesses in Hilty's methodology in making his conclusions regarding the tire tracks where the encounter took place.

At trial, Hilty testified that he was a law enforcement officer with over twenty years of experience, that he had experience working all aspects of investigations, and that he had training as a firearms instructor, as a generalist instructor, and as a driving instructor. Hilty testified that he had been teaching at the police academy for over six years for the Missouri Sheriff's Association.

Hilty testified that he assisted in searching for a pickup truck which had been involved in an incident, that he responded to the scene where the truck and Kelley were located, and that the truck was located in a place that was visible from the road but difficult to see due to vegetation. Hilty said they found coiled-up wire approximately fifteen yards from the truck.

Hilty further testified at trial that he then met Wilson at the scene of the incident and that this occurred after the apprehension of Kelley and the processing of the truck. Hilty said he examined the ground at the scene of the incident and took photographs. Hilty spoke with Wilson regarding his account of how the incident occurred, but did not speak with Kelley regarding the incident. Hilty testified that there were spin marks in the driveway going onto the pavement as indicated from the direction that the gravel was

thrown and the prints left by the tires. Hilty indicated that there were scuff marks in the dirt, and that black marks began at the edge of the pavement with a lighter black mark starting across the road, and then marks going up the highway. Hilty testified that Wilson had shown him where the vehicles were located, and that Hilty was able to "figure out from what was laid on the ground" that Wilson's story matched "what was laid out on the ground as far as tire tracks and such." Hilty then was cross-examined about the photographs at the scene and admitted that the photographs had been lost.

At the evidentiary hearing, trial counsel testified that he was not sure why he did not cross-examine Hilty regarding his qualifications in analyzing the spin marks, but that he believed the testimony regarding the spin marks "was straight forward and either there were spin marks or there weren't." Trial counsel testified that he did not believe it was necessary to cross-examine Hilty about the source of the tire marks further, and that he believed "it would have been superfluous or a waste of time to go into it much deeper." Trial counsel testified that a trial lawyer must pick and choose what is presented to the jury, and that it is important not to call undue attention to things that could be hurtful to his case.

Hilty testified at the evidentiary hearing on August 19, 2021 that he had difficulty remembering the events of September 9, 2013 or his testimony at the trial on April 21, 2015, and relied on his report made at the time for much of his testimony regarding what occurred in 2013 and 2015. Hilty testified that he met with Wilson at the scene of the incident and that his general practice would be to look for footprints or tire tracks to

24

photograph. Hilty testified that he is qualified to teach at the academy on all general topics due to his license as a general instructor issued by the Peace Officer Standards and Training Commission, and that this license allowed him to teach most topics except for a few specialties. One topic this license qualified Hilty to teach is accident investigation. Hilty had significant training and experience in accident investigation, including collecting measurements and data from a scene to figure out what happened at a given scene. Hilty acknowledged that he was not certified as an accident reconstructionist, but testified that accident investigation is a separate curriculum from accident reconstruction, and that accident reconstruction skills would be unnecessary to examine the marks on the ground and compare them to Wilson's story. Hilty testified that he would have known the difference between marks made by Wilson's vehicle and the S10 driven by Kelley.

The motion court found that it was clear from the record that Hilty was more than qualified to make the determination regarding the tire marks. The motion court concluded that Kelley had failed to establish that his counsel's performance was deficient or that Kelley was prejudiced.

On appeal, Kelley argues that the motion court's conclusion is clearly erroneous: that he was not asserting that Hilty was not qualified, but instead, that effective cross-examination of Hilty could have diminished the weight of his testimony.

However, Kelley neglects to recognize that, had such extensive cross-examination occurred regarding Hilty's qualifications, then quite a lot of information regarding Hilty's experience, training, and knowledge with regard to accident investigations could have

25

been revealed to the jury. At trial, during Hilty's direct examination, some of his qualifications and experience were presented to the jury, but none of it was specifically connected to the type of investigation Hilty performed at the scene of the incident. However, as the transcripts of the evidentiary hearing revealed, Hilty had specific training and experience with accident investigation, and was qualified to teach accident investigation. Such additional details (which had not been revealed at trial) regarding Hilty's qualifications and experience could have had the effect of lending additional credibility to Hilty's testimony, and, by extension, to Wilson's testimony. That is, cross-examination regarding Hilty's qualification could have placed undue attention on Hilty's ability to make observations from the scene and thereby have a detrimental effect on Kelley's defense. As trial counsel testified at the evidentiary hearing, it is important for a trial attorney to avoid such outcomes. In this matter, it was reasonable for trial counsel to avoid cross-examining Hilty further about his qualifications.

Kelley argues that further cross-examination of Hilty would have undermined Hilty's observations, which was necessary to do because Hilty's testimony regarding the tire marks at the crime scene lent support to Wilson's credibility. Kelley argues that this would have provided Kelley a more viable defense. We disagree. None of the cross-examination Kelley argues should have been performed would have appreciably changed Hilty's testimony that he investigated the scene soon after the incident, that he saw the tire marks and gravel that he saw, and that what he saw matched Wilson's story.

Kelley posits that the evidence adduced at the evidentiary hearing demonstrated other weaknesses in Hilty's testimony that should have been explored at trial. Kelley asserts that it was established at the evidentiary hearing that Hilty went to the scene of the incident about two hours after the police had been called and that the scene had not been cordoned off in the interim. However, it would have been plainly apparent from the testimony at trial that a substantial amount of time had elapsed before Hilty examined the crime scene. Hilty's trial testimony indicated that, prior to meeting with Wilson at the crime scene, he and other law enforcement officers had to spread out and search for the truck driven by Kelley, that Hilty had then gone to where Kelley and the truck were located, and that Hilty then assisted with processing the truck and site where the truck was found. Although cross-examination of Hilty at trial could have revealed that the scene had not been cordoned off in the two hours between the incident and Hilty's investigation (and that Hilty could not thus rule out the possibility that other vehicles had driven on the driveway in the interim), the record also indicates that the house was vacant so as to diminish the potential for such an occurrence in that limited time frame.

Kelley argues that further cross-examination of Hilty would have revealed that Wilson pointed things out at the scene of the incident. However, trial counsel did elicit testimony on cross-examination that Wilson was present at the scene and that Wilson provided details as to what occurred. Kelley argues that trial counsel failed to cross-examine Hilty about whether Hilty ever spoke with Kelley; whereas, trial counsel did, in fact, cross-examine Hilty about whether he spoke with Kelley.

27

Kelley argues that cross-examination would have revealed that Hilty could not tell the difference between Kelley's truck and Wilson's vehicle. However, Hilty clearly testified at the evidentiary hearing that he would know the difference between marks left by the two vehicles.

The motion court did not err in determining that Kelley failed to establish that he received ineffective assistance of counsel. Kelley has failed to overcome the presumption that his counsel's decision not to cross-examine Hilty further (or differently) was a matter of trial strategy. *Barton*, 432 S.W.3d at 750. Further cross-examination of Hilty regarding his qualification could have had a negative effect on Kelley's defense. Although cross-examination on other topics might have had an effect beneficial to Kelley's defense, trial counsel's performance did not fall outside the "wide range of professional competent assistance." *Hosier*, 593 S.W.3d at 81.

Point three is denied.

### Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.

28